[Crim. No. 43458. Second Dist., Div. Five. Sept. 27, 1983.]

THE PEOPLE, Plaintiff and Respondent, v.
RONALD BRUCE BASS, Defendant and Appellant.

**Counsel**

Robert McMahon, under appointment by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Carol Wendelin Pollack and Jennifer S. Cady, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**HASTINGS, J.**—Penal Code section 12022.7 provides for a three-year sentence enhancement where the defendant, "with the intent to inflict such injury, personally inflicts great bodily injury on any person other than an accomplice in the commission or attempted commission of a felony." ██ The issue in this appeal is whether appellant, having been found to lack the capacity to form the specific intent to kill, could form the specific intent to inflict great bodily injury, making his sentence subject to enhancement under section 12022.7.

The essential facts are not in dispute. On February 16, 1982, while under the influence of phencyclidine (PCP), alcohol and possibly marijuana, appellant attacked his common law wife and 10-day-old son with a kitchen knife, inflicting several stab wounds on his wife and disemboweling his son. Appellant was charged in count I with the attempted murder of his son (Pen. Code, §§ 187 and 664) and in count II with assault with a deadly weapon (Pen. Code, § 245, subd. (a)) upon his wife. Count I also included special allegations for use of a deadly weapon (Pen. Code, § 12022, subd. (b)) and infliction of great bodily injury (Pen. Code, § 12022.7).

Appellant originally pleaded not guilty as to both counts and denied the special allegations, but later changed his plea to not guilty and not guilty by reason of insanity. The court appointed two psychiatrists to examine appellant, pursuant to Penal Code section 1027. Appellant waived trial by jury. The evidence presented at trial, which was divided into guilty and sanity phases, was as follows:

Appellant and his common law wife, Carolyn Black, had lived together for two years. On February 6, 1982, Ms. Black gave birth to appellant's son, Ronald Bruce Bass, Jr. A few days after the baby's birth, appellant was layed off from his job as a doorman at the Circus Disco in Hollywood.

On the morning of February 16, 1982, appellant left the couple's apartment early in the morning to go to the unemployment office. As it turned out, the office had been moved to a new location, so appellant decided to return home. The rest of the day was a routine one in the Bass household; appellant fixed breakfast and lunch, and helped Ms. Black bathe and feed Ronald Jr. Ms. Black testified that appellant's behavior was normal and he was acting like a happy father.

After lunch, Ms. Black laid down to take a nap, and appellant indicated that while she slept he was going to drink some "Night Train" wine and watch television. At approximately 4 p.m., Ms. Black woke up when the

telephone rang. Appellant answered the phone. According to Ms. Black, the tone of appellant's voice was normal, but he "looked like a wild person." Ms. Black got up to go to the restroom and appellant, as was the normal practice, followed her. While Ms. Black used the restroom, appellant sat on the bathtub approximately three feet away from her. Despite the fact that his eyes were bulging out of his head and moving in a circular motion, his speech was accelerated, and his head was tilted to one side, appellant insisted that nothing was wrong. When Ms. Black went into the kitchen to get some water, appellant prevented her from doing so and told her to lie down on the bed, which she did. He ordered her to light a "joint" for him and she complied.

Appellant did not take any hits off the joint, but instead began to "wrestle" on the bed with Ms. Black. Appellant was not as playful as usual, however; he began slugging Ms. Black, holding her down on the bed and choking her. Ms. Black lost consciousness several times during their 10-minute "wrestling match." They fell to the floor and Ms. Black passed out again. When she came to, she felt something puncturing her arm and neck. Although appellant was lying on top of her, Ms. Black managed to fight back and escape from the apartment. When she left the apartment, Ronald Jr. was asleep in the bassinet.

Ms. Black, wearing no clothes except for a blue bra, and bleeding in several places,[1] ran downstairs to the apartment occupied by Henry Kent. Another neighbor, Dorothy Moss, heard Ms. Black screaming that appellant was ill and was going to kill the baby. Ms. Black took refuge in Kent's apartment, and Kent called the police. Meanwhile, Dorothy Moss went upstairs. Appellant came to the door, completely nude and holding a knife in his right hand. Appellant's eyes were watery and he was moving his mouth but could not speak. When Ms. Moss asked appellant what was wrong with the baby, he raised the knife in the air. Ms. Moss never did see the baby.

Officer Richard Henry arrived at the scene, and after talking with Ms. Black, went upstairs to find appellant. When Officer Henry reached the apartment, appellant was standing in the doorway with the baby in his arms. There was blood on the baby. Appellant told Officer Henry, who is black, "You're like me, you can come in. All the rest of you honkie mother fuckers stay outside." (Appellant was referring to a Caucasian officer, Sergeant Van Fleet.) Several other officers arrived and helped Officer Henry subdue appellant. Sergeant Van Fleet took Ronald Jr. from the apartment and handed him to paramedics. A bloody kitchen knife was recovered from

---

[1]Ms. Black suffered stab wounds in the right arm, shoulder and neck, and on the right side of the mouth.

the apartment. Officer Stephen Murphy testified that he found what looked like a human organ in the hall outside the apartment. This turned out to be the small intestine of Ronald Jr.

As appellant was being taken to the police car, he asked Officer Henry how Carolyn was, and Officer Henry replied, "She's doing fine, but how about the baby?" Appellant said, "I don't give a fuck about the baby." Appellant also told Officer Henry that he smoked "Sherms" (a street name for PCP-dipped cigarettes) and that he bought the Sherms from "Fat Boy." Appellant was taken to the police station and placed in a padded cell, where he continued to exhibit strange behavior.

Dr. John Garry treated Ronald Jr. at County-USC Hospital and performed surgery. Dr. Garry testified that the child had stab wounds in the chest, on the right cheek (which severed a portion of the facial nerve) and one near the anus. In Dr. Garry's opinion, the baby's intestines were pushed out through this last wound due to pressure from the baby's crying. However, since the small intestine is attached to the colon, it was Dr. Garry's opinion that the intestine was deliberately severed after it came out of the baby's body. Although police officers delivered the severed intestine to Dr. Garry in a plastic container, the intestine was useless because it did not have an adequate blood supply. Ronald Jr. survived the injury, but is without a small intestine to absorb nutrients into the body and will have to be fed these nutrients intravenously for the rest of his life.

Since the evidence at trial pointed overwhelmingly to appellant's guilt, the real issue was of course his state of mind at the time of the offense. By the time of trial, appellant had been examined by three psychiatrists and two psychologists, all of whom testified. Dr. Rex Beaber, testifying for the People, was of the opinion that appellant was sane at the time of the offense, based upon the doctor's determination that appellant's mental state, however bizarre, was the product of knowing and voluntary ingestion of PCP, combined with alcohol and marijuana.[2] Dr. Beaber testified that appellant had a relatively sophisticated street appreciation of the effect of PCP upon behavior, was secretive about his use of the drug, and was continuously intoxicated for the 48-hour period prior to the offense. Dr. Beaber further stated that alcohol and marijuana potentiate the effects of PCP, and it was these three drugs acting in concert which caused appellant's behavior.

Doctors Herbert A. Robinson, Blake Skrdla, Alvin Davis and Alfred Coodley were all of the opinion that appellant was insane at the time of the

---

[2]With the exception of appellant's statement to Officer Henry that he smoked "Sherms," the only evidence regarding appellant's use of PCP came in the form of testimony from the various doctors about appellant's statements to them. Appellant did not testify.

offense. All based their opinions on appellant's use of PCP. Dr. Robinson testified that appellant had a chronic continuous use of PCP, did not possess the specific intent to commit murder, and did not have the mental capacity to harbor malice, premeditate, or "meaningfully and maturely reflect upon the gravity of the contemplated act." Dr. Skrdla agreed that appellant did not have the mental capacity to form the specific intent to kill or to harbor malice aforethought. Dr. Davis based his opinion of appellant's insanity at the time of the offense to "ongoing alcoholism and drug dependency, primarily being that of PCP, and an acute intoxication at the time of the offense, coupled with severe depression associated with joblessness." In the opinion of Dr. Coodley, appellant had suffered from a PCP "flashback phenomenon" related to a childhood incident in which a neighbor child had killed her mother and grandmother. In Dr. Coodley's opinion, the instant offense could be termed a "retaliation for what that child had done." None of the other expert witnesses thought that appellant has suffered such a "flashback," although all agreed that he was psychotic.

The court found that appellant had committed the instant offenses and that he was sane at the time, his mental state having been induced by voluntary intoxication. The court determined, however, that appellant did not have the capacity to form the specific intent to kill required for attempted murder as charged in count I, and reduced the conviction on that count to assault by means of force likely to produce great bodily harm (Pen. Code, § 245, subd. (a)), which the People had elected to plead as a lesser included offense. Appellant was also found guilty on count II with respect to the assault on Carolyn Black. Appellant was sentenced to the upper term of four years on count I, with a consecutive three-year sentence for the great bodily injury enhancement.[3] Sentence on count II was stayed.[4]

Appellant contends that section 12022.7 requires a finding of and substantial evidence of specific intent to inflict great bodily injury, and since no such finding was made here, and there was substantial evidence that appellant lacked the capacity to form such specific intent, the great bodily injury enhancement must be stricken. We hold that the enhancement was properly imposed, and affirm the conviction.

We first examine the nature of the intent required to support imposition of an enhancement under section 12022.7. As the court noted in *People* v. *Hood* (1969) 1 Cal.3d 444 [82 Cal.Rptr. 618, 462 P.2d 370], "[s]pecific

---

[3]The use allegation in count I was stricken because use of a deadly weapon was an element of the lesser offense for which appellant was convicted.

[4]Although the imposition of consecutive terms would have been supportable on the record, since the crime involved multiple victims (Cal. Rules of Court, rule 425(a)(4)), the court honored the request of Ms. Black that appellant not be punished for what he did to her.

and general intent have been notoriously difficult terms to define and apply, and a number of text writers recommend that they be abandoned altogether." (1 Cal.3d at p. 456.) ■ The court emphasized what it felt was the important difference between the two: "When the definition of a crime consists of only the description of a particular act, without reference to intent to do a further act or achieve a future consequence, we ask whether the defendant intended to do the proscribed act. This intention is deemed to be a general criminal intent. When the definition refers to defendant's intent to do some further act or achieve some additional consequence, the crime is deemed to be one of specific intent." (*Id.*, at pp. 456-457.)

The issue before the court was whether the appellant's voluntary intoxication would provide a defense to the crime of assault, and resolution of the issue appeared to depend on whether the crime of assault was a specific or general intent crime. As the court noted, however, labels can be misleading: "It is true that in most cases specific intent has come to mean an intention to do a future act or achieve a particular result, and that assault is appropriately characterized as a specific intent crime under this definition. An assault, however, is equally well characterized as a general intent crime under the definition of general intent as an intent merely to do a violent act. Therefore, *whatever reality the distinction between specific and general intent may have in other contexts, the difference is chimerical in the case of assault with a deadly weapon or simple assault. Since the definitions of both specific intent and general intent cover the requisite intent to commit a battery,* the decision whether or not to give effect to evidence of intoxication must rest on other considerations." (*Id.*, at pp. 457-458; italics added.) The court concluded that since an intoxicated person is "capable of forming an intent to do something simple, such as strike another," neither assault with a deadly weapon nor simple assault were offenses requiring " 'an intent that is susceptible to negation through a showing of voluntary intoxication.' " (*Id.*, at p. 458.)

■ Section 12022.7 requires that the defendant possess the specific intent to inflict great bodily injury. (CALJIC No.17.20 (1979 rev.); *People v. Wolcott* (1983) 34 Cal.3d 92 [192 Cal.Rptr. 748, 665 P.2d 520].) The word "inflict" (from the Latin *fligere,* meaning "to strike") has been variously defined as "to lay (a blow) on" (Webster's Third New Internat. Dict. (1981) p. 1170) and "to cause or carry out by physical assault or other aggressive action" (The American Heritage Dict. (2d College Ed. (1982) p. 660). Thus, the "intent to inflict great bodily injury" is merely the intent to commit a violent act or the intent to commit a battery which is required for assault, and the intent requirement of section 12022.7 is met when such injury is caused by the deliberate act of the defendant, and not accidentally.

Two decisions of our Supreme Court illustrate this point. In *People* v. *Miller* (1977) 18 Cal.3d 873 [135 Cal.Rptr. 654, 558 P.2d 552], defendant Miller and an accomplice were engaged in the holdup of a jewelry store when Miller attempted to draw a gun from a shoulder holster. Burk, a store employee, grabbed Miller's wrist and in an ensuing struggle the two men fell to the floor. As Burk tried to get up, Miller, who had retained possession of the gun, pulled the trigger and shot Burk in the chest area. Burk fell back and Miller shot him a second time, the bullet piercing Burk's right arm.

Miller was charged with robbery under former Penal Code section 213, which provided for a minimum state prison term of 15 years for a robbery conviction in which the defendant, "in the course of commission of the robbery, with the intent to inflict such injury, inflicted great bodily injury on the victim of the robbery."[5] Miller argued that he could not be held for the augmented penalty because the evidence did not support a finding that he intended to shoot Burk. The Supreme Court, rejecting this argument, stated: "Defendant's argument is that the gun was first discharged while he grappled with Burk for its possession and that those circumstances precluded a finding that he intentionally sought to injure Burk. But defendant fired the second shot while Burk was falling backwards and defendant cannot reasonably argue that such *shot* was unintended." (18 Cal.3d at p. 883; italics added.)

In the recent case of *People* v. *Wolcott, supra,* 34 Cal.3d 92, defendant Wolcott entered a grocery store, asked the proprietor, King, for a half pint of gin, and drew a pistol as King was ringing the sale on the register. Wolcott then put the gun on the counter (apparently so he could remove the money from the register) and King tried to take it. The two men struggled for the gun, and Wolcott tried to fire it but King prevented him from doing so by placing his hand between the hammer and the firing pin so the gun could not discharge. King fell to his knees and lost his grip on the gun, whereupon Wolcott pulled the trigger again. The bullet struck King in the calf, with fragments lodging in his arms and legs.

The court rejected Wolcott's argument that it was reasonable to infer from this evidence that he did not intend to inflict great bodily injury upon King, and the jury might have come to such a conclusion had it been properly instructed on the issue of intent. The court commented that "[t]he only reasonable inference from Wolcott's act of continuing to pull the trigger

---

[5]Section 12022.7, added to the Penal Code as part of the Uniform Determinate Sentencing Act of 1976, superseded the specific great bodily injury provisions of former sections 213, 264 and 461. (*People* v. *Cole* (1982) 31 Cal.3d 568, 578 [183 Cal.Rptr. 350, 645 P.2d 1182].)

after King had released his hold on the gun is that Wolcott *intended to shoot* King." (*Id.,* at p. 109; italics added.)[6]

*Miller* and *Wolcott* make it clear that the "intent" to which section 12022.7 refers is the intent to do the act which causes the victim to suffer great bodily injury. We now address appellant's contention that the court erred when it failed to make an express finding that appellant had the capacity to form such intent.

In *People* v. *Salas* (1976) 58 Cal.App.3d 460 [129 Cal.Rptr. 871], upon which appellant relies, the court held that the trial court erred in failing to instruct the jury under CALJIC No. 2.02, relating to the proof by circumstantial evidence of specific intent to inflict great bodily injury. That instruction generally provides that if evidence of specific intent is susceptible of two reasonable interpretations, one of which points to the existence of specific intent and the other to the absence of such intent, the jury must adopt the interpretation most favorable to the defendant. Although appellant was tried by the court and not by a jury, he argues that the same rules apply: since there was insubstantial evidence of specific intent to inflict great bodily injury, but substantial evidence that he lacked the capacity to form such intent, an express finding on the issue was required.

*Salas,* however, is inconsistent with the later decisions of the Supreme Court in *People* v. *Miller, supra,* 18 Cal.3d 873, and *People* v. *Wolcott, supra,* 34 Cal.3d 92. The *Miller* court rejected the defendant's claim that the trial court erred by rejecting a proposed instruction based upon CALJIC No. 2.02, stating that "the court expressly instructed on the proof necessary to support a finding that defendant intentionally inflicted great bodily injury. Thus the jurors were instructed that they must find beyond a reasonable doubt that defendant entertained a *specific intent* to inflict such injury and that 'the intent with which an act is done is shown by the circumstances attending the act, the manner in which it is done, the means used, and the soundness of mind and discretion of the person committing the act.' (See CALJIC No. 3.34.) In view of the foregoing the jury was properly instructed in the prevailing circumstances and, on the record, defendant cannot complain of adverse findings on the issue of his intent to commit great bodily injury." (18 Cal.3d at p. 884.) The same instruction was found to be sufficient in *Wolcott.*

When the court here imposed the enhancement pursuant to Penal Code section 12022.7, it impliedly found that appellant possessed the req-

---

[6]On the issue of whether the shot was intentionally fired, the court noted that Wolcott's situation differed from that of the defendant in *Miller* "only in that, although Wolcott pulled the trigger during the struggle, no shot was fired until King lost his grip on the gun." (34 Cal.3d at p. 109, fn. 8.)

uisite intent to support the imposition of the enhancement. The relevant inquiry is whether the court's finding is supported by substantial evidence, not whether the evidence might have been consistent with a different conclusion. Clearly, the court's finding was correct.

While appellant, due to his ingestion of PCP and possibly other substances, lacked the capacity to form the more complex mental state required for attempted murder, he was nonetheless capable of forming the intent to do a violent act. The evidence supports the conclusion that the *infliction of the injury* upon Ronald Jr. was intentional. The baby suffered several stab wounds, one of which caused his small intestine to be pushed out of his body. Appellant then apparently "shaved off" the intestine at the point where it connected to the colon, thus cutting off the blood supply and rendering the organ forever useless. Appellant was aware of what he had done but told the police that he "didn't give a fuck about the baby." All of this antisocial behavior may have been due to appellant's intoxicated state, but it was a situation which appellant brought upon himself. As the trial court stated, appellant "chose to live [that] way and he took the chance."

The judgment is affirmed.

Stephens, Acting P. J., and Ashby, J., concurred.

A petition for a rehearing was denied October 26, 1983, and appellant's petition for a hearing by the Supreme Court was denied December 21, 1983.