[No. H005175. Sixth Dist. July 27, 1990.]

THE PEOPLE, Plaintiff and Respondent, v.
JOHN SANTOS, Defendant and Appellant.

728

**COUNSEL**

Carlo Andreani, under appointment by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Richard B. Iglehart, Chief Assistant Attorney General, John H. Sugiyama, Assistant Attorney

General, Donna B. Chew and Violet M. Lee, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

ELIA, J.—John Santos appeals from a judgment of conviction of two counts of lewd and lascivious acts by force on a child under the age of fourteen years (Pen. Code, § 288, subd. (b)),[1] four counts of oral copulation by force with a child under the age of fourteen years and more than ten years younger than defendant (§ 288a, subd. (c)), and one count of penetration by a foreign object by force (§ 289, subd. (a)). The jury also found true the allegation that defendant used force likely to produce great bodily injury (§ 667.7, subd. (a)). The jury found not true the allegation that defendant inflicted great bodily injury (§ 12022.8). The court found true the allegation that defendant had been convicted of two prior serious felonies (§§ 667; 1192.7, subd. (c)) and that defendant had served two prior separate prison terms for specified felonies (§ 667.7, subd. (a) (1)), thus qualifying him as a habitual offender.

The court sentenced defendant to a total prison term of 37 years on the 7 counts. In addition, the court sentenced defendant to life in prison as a habitual offender.

Defendant appeals. We affirm the judgment of conviction but reverse the finding of habitual offender status. We vacate the sentence imposed and remand for resentencing.

### FACTUAL BACKGROUND

The People presented evidence that defendant had lived with Elaine Velez in a five-year, on-again, off-again relationship. Their sons, ages one and four, and one of Velez's daughters by another relationship also lived in their San Jose apartment. The daughter, whom we will refer to as M., was 11.

On the evening of March 19, 1988, Velez went out with her adult daughter, who left her four-year-old son at the apartment for the night. Leaving all four children in defendant's care, Velez and her daughter went to San Francisco with a man Velez was seeing without defendant's knowledge. The

---

[1] All statutory references are to the California Penal Code.

man and Velez dropped the daughter at her home and went to a motel for the night.

M. testified that, at approximately 5 a.m. the following morning, defendant jumped on top of her while she was sleeping. Defendant, who was naked, hit M. with his fist several times about the head, causing bruising, a bloody nose, and a swollen eye and lip. Defendant directed M. to the bathroom to clean up. She wiped her nose with toilet paper, which she flushed. Defendant followed M. into the bathroom and began rubbing his penis against her buttocks. M. asked what defendant was doing and was fearful he might hit her again.

Defendant told M. to hold his erect penis as they left the bathroom. They walked to a couch in the living room, where defendant ordered M. to perform oral copulation. M. resisted but when defendant threatened to hit her, she complied and followed defendant's directions to bite him and to "[d]o it faster."

Defendant ordered M. to move to another couch and to renew oral copulation. He threatened to hit her and told her to "[s]uck it like a lolly pop." Defendant ordered M. to undress. When she hesitated, he threatened her again and pulled her clothes off. He put his mouth on her "private parts" and inserted his finger, which "hurt."

Defendant then lay on his back on the rug and ordered M. to orally copulate him again. When he threatened to hit her, she complied. Defendant ejaculated, depositing semen on the rug. Defendant wiped his leg and the rug with a white cloth. M. dressed and complied with defendant's order to fetch his clothes. After defendant dressed, he followed M. into the kitchen and rubbed his penis against her buttocks. He then lay down on a living room couch. He told M., "If you tell your mom, I'll do it again."

Around 8 a.m., the adult daughter went to the apartment to pick up her son. She noticed M.'s black eye; she found M. nervous, scared, and reluctant to tell what had happened. Fifteen minutes later, she left with her son and M. to meet Velez at a restaurant. While Velez waited at the restaurant, she phoned defendant to say that she was leaving him and that she would give him custody of their sons. After M. arrived and told her mother what had happened, Velez phoned the police. Velez, her adult daughter, and M. met the police at the apartment, where defendant was arrested.

M. walked through the apartment, explaining to the officer what had happened. He found blood on M.'s mattress and on a white towel. He found a stain on the rug where M. said defendant had ejaculated. Later, Velez

found defendant's white T-shirt, crumpled and stuck together, behind a toy box in the living room. M. provided a consistent report to an officer at the police station. Both officers noticed M.'s black eye and found her to be scared and timid.

M. was examined by a doctor, who found a bruise on the upper lid of her left eye but no signs of trauma in the vaginal area. Testifying for the prosecution, the doctor stated that a blow to the eye can cause internal bleeding of the eyeball and that a forceful blow to the head can cause brain injury. A doctor for the defense testified that the final report on M. indicated no definite physical evidence of anal or genital injury, but that this finding did not rule out the possibility of sexual contact.

A criminalist testified for the People that he did not detect semen on two oral swabs taken from M. but that semen could be destroyed by saliva or by drinking water. M. ingested water after the incidents and before the swabs. The criminalist detected saliva on two penile samples taken from defendant. He found four stains on the white T-shirt, one of which was a mixture of saliva and semen consistent with defendant's blood type, secretor status, and genetic markers. The criminalist testified that only 1.25 per cent of the population would match the same factors.

Defendant's forensic expert testified to the presence of semen on the white T-shirt, but she also tested a stain that she believed could not have come from either defendant or M. She found a negligible amount of semen in one penile sample and none in the other. She also detected the presence of either perspiration or saliva on the T-shirt and the penile samples.

Defendant did not testify at trial. Defendant's nephew testified that defendant telephoned him at about 4 a.m. on the morning of the alleged incidents. Defendant was distraught, apparently because Velez had not returned home. The nephew arrived at the apartment approximately 45 minutes later. He advised defendant to move out immediately and phoned defendant's brother to bring his truck. The nephew testified that while he and defendant waited, M. peeked out of her bedroom. He said, "Hi," and she returned to bed. The brother arrived about 6 a.m. After determining that there was not enough room in the truck for defendant's belongings, the brother and nephew left half an hour later.

Defendant telephoned his brother at 8 a.m. to discuss securing the apartment. Shortly thereafter, the brother arrived at the apartment and began changing the locks. He testified that he stopped when the police arrived around 9 a.m.

The nephew also testified regarding his visit to another apartment in 1986. Defendant and Velez were watching an X-rated movie depicting oral copulation. Velez was unconcerned that M. was also viewing the movie from the dining room, stating that "she'll see it on the street anyway."

Defendant's niece testified that she lived with defendant and Velez in another apartment for two and a half months in 1986. The niece observed M. viewing X-rated movies; Velez did nothing to prevent M.'s activity. On cross-examination, the niece acknowledged that M. may have been with her father in Reno for two months out of that period.

On cross-examination, Velez testified that defendant owned several X-rated movies, which he watched with his nephew but never in M.'s presence. M. testified on cross-examination that she knew of X-rated movies in the house but that she never watched them.

### DISCUSSION

### I. Ineffective Assistance of Counsel

"[T]he burden of proving a claim of inadequate trial assistance is on the appellant. [Citation.] Thus, appellant must show that trial counsel failed to act in a manner to be expected of reasonably competent attorneys acting as diligent advocates." (*People* v. *Pope* (1979) 23 Cal.3d 412, 425 [152 Cal.Rptr. 732, 590 P.2d 859, 2 A.L.R.4th 1].)

Defendant argues that his legal representation was inadequate on two grounds. First, he argues that counsel failed to assert a critical argument in moving to set aside the information under section 995. Second, he maintains that trial counsel should have objected to questions asked of defendant's nephew on cross-examination and to portions of the prosecutor's closing argument pertaining to the nephew's testimony.

*The Section 995 Motion*

Initially, the People charged defendant by complaint with one count of lewd and lascivious acts by force on a child under the age of fourteen years (§ 288, subd. (b)) and alleged one prior serious felony. Over defendant's objection at the preliminary hearing, the people presented evidence not only of the charged offense but also of other offenses in order to show defendant's intent. (See § 288, requiring "the intent of arousing, appealing to, or gratifying the lust or passions or sexual desires of [defendant] or of such child . . . .") Thereafter, the People filed an information, later amended to add

allegations of another prior serious felony and of habitual offender status, which included six additional offenses.

■ Trial counsel moved to set aside the amended information on several grounds. But defendant maintains that counsel should have argued for dismissal of the additional charges because they were not adequately related to the offense initially charged.

■ Under section 739, within 15 days after the preliminary hearing, the district attorney must file an information in the superior court charging "the defendant with either the offense or offenses named in the order of commitment or any offense or offenses shown by the evidence taken before the magistrate to have been committed." The statute is not taken literally, however, for to allow the addition of any offense disclosed by the evidence at the preliminary hearing would violate a criminal defendant's constitutional right to a prior determination by a magistrate or a grand jury that prosecution is warranted. (*Jones* v. *Superior Court* (1971) 4 Cal.3d 660, 664 [94 Cal.Rptr. 289, 483 P.2d 1241].) Thus, an offense charged after the preliminary hearing will be struck unless "(1) the evidence before the magistrate shows that such offense was committed (Pen. Code, § 739), and (2) that the offense 'arose out of the transaction which was the basis for the commitment' on a related offense. [Citations.]" (*Id.* at pp. 664-665.)

■ Defendant argues that the offense initially charged and the offenses added in the amended information were related, at most, as part of a common scheme or design, which does not satisfy the "transaction" test. Defendant relies upon *People* v. *Bartlett* (1967) 256 Cal.App.2d 787 [64 Cal.Rptr. 503], in which defendants were initially charged with two counts of burglary, one involving victim A and one involving victim B. The information filed after the preliminary hearing added a third count of burglary from victim B, occurring on the same day as the burglary from victim A but four months after the other burglary from victim B. The Court of Appeal reversed defendants' convictions on the third count because "the relationship between the added offense and the crimes designated in the commitment is merely one of common scheme or design, a relationship which in and of itself would be insufficient. [Citations.]" (*Id.* at p. 791.) Relying upon *People* v. *Downer* (1962) 57 Cal.2d 800 [22 Cal.Rptr. 347, 372 P.2d 107], the court reasoned: "Although the victim in the added offense is the same as the victim in one of the offenses on which defendants were held to answer, the evidence does not disclose a continuity of a course of criminal conduct between defendants and the victim . . . ." (*People* v. *Bartlett, supra*, 256 Cal.App.2d at p. 791.)

In *Downer,* defendant was initially charged with one count of incest and one count of rape, both occurring on December 5, 1959. At the preliminary

hearing, defendant's daughter testified to similar occurrences over a two-year period. Particularly, she testified that on December 16, 1959, defendant came to her bedroom as he had on December 5. They had a fight about sex, the daughter's nose was bloodied, and defendant angrily departed without sexual intercourse. After the hearing, the People filed an information including a third count for attempted incest on December 16. The Court of Appeal observed: "The record discloses that the count of attempted incest was related to and connected with the transaction which formed the basis of the commitment order. It was a part of defendant's course of conduct which he had engaged in with his daughter over a long period of time; and there was sufficient evidence adduced at the preliminary examination, considering the proceedings as a whole, to permit the district attorney to add the count of attempted incest and to support the filing of the information." (*People* v. *Downer, supra,* 57 Cal.2d at pp. 809-810.)

The instant case is closer to *Downer* than to *Bartlett,* although even *Downer,* in which the episodes occurred 11 days apart, could be viewed as a close case compared to the case at hand. Here, all of the offenses charged in the amended information related to conduct directed at a single victim over no more than a few hours' time. Punctuated only by changes in location from one place in the apartment to another, the incident constituted a single transaction from the first sexual contact in the bathroom to the last contact in the kitchen. The People properly included the additional counts revealed by M.'s testimony at the preliminary hearing. Defendant's trial counsel was not derelict in failing to argue for dismissal based on the "transaction" test.

*The Nephew's Testimony*

As noted above, M. testified that the incident began at approximately 5 a.m. M's testimony was countered by defendant's nephew, who testified that defendant phoned him about 4 a.m. In response, the nephew went to the apartment and was there from about 4:45 a.m. until 6 a.m. During that time, according to the nephew's testimony, M. peeked out of her bedroom and then returned to bed.

On cross-examination, the prosecutor asked the nephew why he had "held this information in all this time and never told a police officer."

The nephew responded: "Why have I kept this? Because I didn't know that the details of the whole case. I didn't know what was said, what—I didn't know anything about what was going on.

"He would not even tell me when he would call me. I'd ask him. Well, what happened? What's going on? Why are you there? What happened? He wouldn't even tell me. Nobody really said anything.

"[PROSECUTOR ]: Q. When did you first learn what the charges were in this case?

"A. I believe it was my mother that had told me about it, and then that's when I said, 'Wait a minute.'

"Q. When did your mother tell you what the charges were?

"A. You want—are you asking me dates again?

"Q. How long ago?

"A. About 3 weeks ago?

"Q. Okay. In the last 3 weeks, you haven't contacted a police officer and told him this story, have you?

"A. No.

"Q. You haven't contacted anyone from the District Attorney's Office, have you?

"A. No.

"Q. And this is the uncle that you're as close to as any two men can be?

"A. Yes."

Defendant argues that trial counsel should have objected to this cross-examination on the grounds of relevancy and defendant's constitutional right to remain silent. Defendant also challenges a portion of the prosecutor's closing argument on the same grounds. Defendant maintains that the nephew, "who had an unblemished police record and possessed substantial employment credentials, presented a particularly formidable defense witness. The district attorney frontally preempted his purportedly unreasonable story because " '[t]he most telling thing' [the nephew] did was not call the police."

Defendant's contention regarding the prosecutor's closing argument is meritless. Read in context, the prosecutor's remark concerning "[t]he most telling thing" referred not to the nephew's subsequent failure to inform the police of his presence in the apartment on the morning of March 20 but, rather, to his failure to call the police on that morning to report Velez's absence. The prosecutor said: "The most telling thing [the nephew] did was,

I said Jee [*sic*], when you got to the apartment . . . , did you call the police, and his immediate response was, why would I call the police? Why ask that? Well, I asked that for a reason, because I was still relying on the defense's opening statement. I thought there was going to be some showing that there was concern for Elaine [Velez]."

We are also not persuaded by defendant's argument regarding the prosecutor's cross-examination of the nephew. In *Doyle* v. *Ohio* (1976) 426 U.S. 610 [49 L.Ed.3d 91, 96 S.Ct. 2240], the Supreme Court held that it was fundamentally unfair to allow a defendant's silence after *Miranda* warnings (see *Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974]) to be used to impeach defendant's explanation at trial. Defendant seeks to extend *Doyle* to prohibit impeachment of a defense witness based upon his failure to come forward earlier. But defendant relies upon several pre- and post-*Doyle* cases in which the court found that the prosecutor engaged in prejudicial misconduct by commenting upon the failure of defendant or his counsel—not a defense witness—to offer exculpatory evidence earlier. (E.g., *People* v. *Lindsey* (1988) 205 Cal.App.3d 112 [252 Cal.Rptr. 96] [prosecutor's closing rebuttal argument condemned defense counsel for failing to inform the police or the district attorney of alibi defense before trial]; *People* v. *Galloway* (1979) 100 Cal.App.3d 551 [160 Cal.Rptr. 914] [prosecutor's cross-examination of defendant concerned his failure to mention alibi prior to trial]; *People* v. *Conover* (1966) 243 Cal.App.2d 38 [52 Cal.Rptr. 172] [in opening and closing remarks, prosecutor commented on defendant's failure to produce alibi witness at preliminary hearing]; *People* v. *Vienne* (1956) 142 Cal.App.2d 172 [297 P.2d 1027] [prosecutor's closing argument concerned defendant's failure to inform police or district attorney's office of alibi presented at trial].)

Unlike the cases relied on by defendant, *People* v. *Ratliff* (1987) 189 Cal.App.3d 696 [234 Cal.Rptr. 502], concerns a prosecutor's cross-examination of defense witnesses regarding their failure to volunteer exculpatory information to the police prior to trial. The court held the inquiry to be proper, and we believe rightly so, "since it was designed to test their credibility, knowledge and recollection. [Citations.] There is nothing inherently improper about cross-examining a defense witness as to his failure to come forward at an earlier date. In fact, the information discovered during this type of questioning may well aid the trier of fact in its effort to determine whether the testimony is an accurate reflection of the truth or a recent fabrication. [¶] Although a citizen ordinarily has no legal obligation to offer exculpatory information to law enforcement officials, there are many situations where the natural response of a person would be to come forward in order to avoid a mistaken prosecution of a relative or friend. In that situa-

tion a witness's silence may be akin to a 'prior inconsistent statement,' and therefore, has probative value. [Citation.]" (*Id.* at pp. 700-701.)

The *Ratliff* court noted situations in which it would not be natural for a witness to volunteer exculpatory information, such as when the witness does not realize he possesses such information. But rather than create a per se rule excluding cross-examination or comment on the subject, the court followed *Com.* v. *Brown* (1981) 11 Mass.App. 288 [416 N.E.2d 218, 224], in requiring the prosecutor to lay a foundation " 'by first establishing that the witness knew of the pending charges in sufficient detail to realize that he possessed exculpatory information, that the witness had reason to make the information available, that he was familiar with the means of reporting it to the proper authorities, and that the defendant or his lawyer, or both, did not ask the witness to refrain from doing so.' " (*People* v. *Ratliff, supra,* 189 Cal.App.3d at p. 701.)

While we do not necessarily agree that in every instance the People must expressly establish each factor suggested in *Ratliff,* we do conclude that the elements listed in *Ratliff* were present in this case. The nephew testified that he learned details of the pending charges about three weeks before trial. Apparently realizing that he possessed exculpatory information, he responded, "Wait a minute." Moreover, he had reason to make the information available because, according to his testimony, he and defendant were "[a]s close as two men can get . . . ." When asked whether he had given the information to the police or the district attorney's office, he simply answered, "No." He did not suggest either on cross- or on redirect examination that he was asked by defendant or his counsel not to reveal exculpatory information. Nor was there an indication by the nephew, who testified that he was the head of the purchasing department for a division of Shell Oil Company, that he was uncertain about how to report exculpatory information to the authorities.

Because we find the cross-examination of defendant's nephew based upon his failure to offer exculpatory information earlier to be both relevant and proper, we hold that defense counsel was not derelict in failing to object.

## II. Jury Instructions

Defendant contends the trial judge erred by refusing to instruct the jury on a lesser related offense, by incorrectly instructing the jury regarding the intent necessary for the § 667.7, subdivision (a), enhancement, and by failing to answer questions posed by the jury.

*Lesser Related Offense*

■ "It is settled that in criminal cases, even in the absence of a request, the trial court must instruct on the general principles of law relevant to the issues raised by the evidence. [Citations.]" (*People* v. *St. Martin* (1970) 1 Cal.3d 524, 531 [83 Cal.Rptr. 166, 463 P.2d 390].) Thus, if there is evidence that could absolve defendant of guilt of a greater offense but support a conviction on a lesser included offense, the court must instruct the jury on the lesser included offense, even over defendant's objection. (*People* v. *Sedeno* (1974) 10 Cal.3d 703, 715-716 [112 Cal.Rptr. 1, 518 P.2d 913], disapproved on other grounds in *People* v. *Flannel* (1979) 25 Cal.3d 668, 684, fn. 12 [160 Cal.Rptr. 84, 603 P.2d 1].) An offense is necessarily included in the charged offense if the charged offense, either by statutory definition or as described in the accusatory pleading, cannot be committed without also committing the lesser offense. (*People* v. *Lohbauer* (1981) 29 Cal.3d 364, 368 [173 Cal.Rptr. 453, 627 P.2d 183].)

■ The trial court does not have a duty to instruct sua sponte on a lesser related, but not necessarily included, offense. As the Supreme Court explained in *People* v. *Geiger* (1984) 35 Cal.3d 510, 530 [199 Cal.Rptr. 45, 674 P.2d 1303, 50 A.L.R.4th 1055], to do so would be to violate defendant's constitutional right to notice of the charges against him. But if defendant requests an instruction on a lesser related offense, it must be given if three requirements are met: (1) There is some basis on which the jury could find the offense to be less than that charged, other than simply an unexplainable rejection of prosecution evidence. (*Id.* at p. 531.) (2) The offense upon which defendant seeks instruction is closely related to that charged and shown by the evidence. "Although some evidence offered by the People or the defendant may indicate that the defendant has committed a crime other than that charged, instructions regarding that crime need not be given unless the evidence is also relevant to and admitted for the purpose of establishing whether the defendant is guilty of the charged offense." (*Ibid.*) (3) A conviction for the related offense would be consistent with defendant's theory of defense. (*Id.* at pp. 531-532.)

■ Defendant argues that the trial court erred in this case by refusing to instruct the jury on misdemeanor battery as a lesser related offense to the counts charged. The trial court denied defendant's request, finding a battery instruction to be inconsistent with defendant's theory of the case.[2]

---

[2] The People also objected on timeliness grounds to defendant's request for a battery instruction, which was asserted after the jury instructions were settled and after the People's closing argument. That was not the basis of the trial court's ruling, however, and the People do not advance the timeliness argument on appeal. (See *People* v. *Stearns* (1971) 14 Cal.App.3d 178, 185 [92 Cal.Rptr. 69].)

We note first that since battery (§ 242) is not a lesser included offense to the offenses charged in this case, the trial judge was not obliged to give the instruction sua sponte. At best, battery was a lesser related offense, and the court was obliged to give defendant's requested instruction only if it satisfied the *Geiger* test. We conclude that the *Geiger* test was satisfied and that the trial court erred in refusing to instruct on misdemeanor battery.

A conviction for battery alone fit precisely with the theory of defense, which sounded as follows: Defendant had a bad night. He was left in charge of four children. He was distraught when Velez failed to return home, and he suspected she was with another man. As the hours passed and his tension mounted, defendant battered M., Velez's child from another relationship. He bloodied her nose, and gave her a black eye and a puffy lip. M. was angry and, in order to retaliate, she concocted the sexual assault story.

The theme continued throughout the trial. In his opening statement, defense counsel stated that "a very unfortunate thing took place. No excuse, no justification. Perhaps any parent [who] had alot [*sic*] of children to take care of in stressful situations, may understand, without accepting, without justification, and [defendant] hit [M.]. . . . [¶] Now, it's not surprising that [M.] is resentful, that her dignity has been afronted [*sic*]. She'd been hurt. So when she was taken to her mother, she first told about the hitting. By the time she got to her mother, she had this story of the sexual assault." Marshalling the evidence in closing argument, defense counsel maintained that, "[M.] was hit. None of it points to a sexual attack." Thus, defendant's theory of defense was perfectly consistent with a conviction of the related offense of battery but not of the charged offenses.

By the same token, there was a basis in the evidence, other than an unexplained rejection of prosecution evidence, on which the jury could find the offense to be less than that charged. Defendant presented testimony that M. had watched X-rated movies, thus suggesting that she had the knowledge necessary to make up the story. Defendant's cousin testified that he was at the apartment during the time that the sexual assaults allegedly occurred, and he observed nothing of the sort. None of the physical evidence demonstrated unequivocally that there had been sexual contact between defendant and M.

Finally, the offense of battery was closely related to the offenses charged and shown by the evidence. All of the counts required proof of "force, violence, duress, menace, or fear of immediate and unlawful bodily injury." (§§ 288, subd. (b); 288a, subd. (c); 289, subd. (a).) Battery is "any willful and unlawful use of force or violence upon the person of another." (§ 242.) The crimes charged and battery protect the same societal interest—the

security of the person. (See *People* v. *Geiger, supra,* 35 Cal.3d at p. 532 [offense of vandalism related to offense of burglary because both protect same societal interest—security of property].) Moreover, the People presented extensive evidence of the initial battery occurring on M.'s bed and of M.'s facial injuries. M. testified again and again that she followed defendant's orders during the sexual encounter because he threatened to hit her. The battery, which occurred immediately before the alleged sexual offenses, likely influenced M.'s compliance with defendant's instructions. It suggested to her that defendant was more than willing to carry out his threats and that the consequences could be painful.

■  Having concluded that the trial court erred in refusing to instruct on the lesser related offense, we must go on to consider whether the error was prejudicial. In *People* v. *Sedeno, supra,* 10 Cal.3d at page 721, the Supreme Court held that "in some circumstances it is possible to determine that although an instruction on a lesser included offense was erroneously omitted, the factual question posed by the omitted instruction was necessarily resolved adversely to the defendant under other, properly given instructions. In such cases the issue should not be deemed to have been removed from the jury's consideration since it has been resolved in another context, and there can be no prejudice to the defendant since the evidence that would support a finding that only the lesser offense was committed has been rejected by the jury." The court applied this reasoning to its review of the lesser related offense at issue in *Geiger.*

We conclude that the trial court's error in this case was harmless. ■  The rationale for requiring instruction on a lesser included or, at defendant's request, a lesser related offense was explained in *People* v. *St. Martin, supra,* 1 Cal.3d at page 533: "The state has no interest in a defendant obtaining an acquittal where he is innocent of the primary offense charged but guilty of a necessarily included offense. Nor has the state any legitimate interest in obtaining a conviction of the offense charged where the jury entertains a reasonable doubt of guilt of the charged offense but returns a verdict of guilty of that offense solely because the jury is unwilling to acquit where it is satisfied that the defendant has been guilty of wrongful conduct constituting a necessarily included offense. Likewise, a defendant has no legitimate interest in compelling the jury to adopt an all or nothing approach to the issue of guilt."

■  In this case, defendant posits that the jury may have believed him guilty only of battery but, unable to convict him of battery based on the instructions given, the jury convicted him of the sexual offenses charged. But the history of jury deliberations in this case, as revealed by the record, indicates otherwise.

In-court exchanges during the two and one-half days of jury deliberation, as well as dates entered on the verdict forms, show that the jury first decided the seven counts and then turned to the enhancements, as per the court's instructions. At that point, the jury submitted two questions to the court: "Was the initial assault of [M.] considered to be an act which occurred *during the commission* of the offenses charged, or, since it was chronologically *before* any of the actual offenses counts, would it not qualify as part of the 'commission' of the crimes? Can we consider this in the voting on the enhanced allegation of inflicting great bodily injury?" Thus, it appears that, in reaching a verdict on the sexual offenses, the jury put aside the initial battery. That offense came into play, at least in the jurors' minds, only upon consideration of the enhancements. And, even for purposes of the enhancements, the jury was uncertain whether the battery could be linked with the commission of the sexual offenses.

The trial judge said that the jury's questions were good ones but that they were up to the jury to decide. Upon further deliberation, the jury found not true the allegation that defendant inflicted great bodily injury. Thus, it would appear that the jury answered the two questions in the negative— that the "initial assault" did not occur "during the commission of the offenses charged" and, therefore, could not be considered in "voting on the enhanced allegation of inflicting great bodily injury." Or it is possible that the jury simply concluded that the bodily injury was not great. In any event, this scenario does not comport with defendant's speculation that the jury found him guilty of battery only and then, in the absence of a battery instruction, settled upon conviction of the offenses charged.

*Intent Under Section 667.7 Subdivision (a)*

The information alleged enhancements under sections 12022.8 and 667.7, subdivision (a). Both statutes refer to section 12022.7.

Section 12022.8 imposes an enhanced sentence upon "[a]ny person who inflicts great bodily injury, as defined in Section 12022.7, on any victim" during the commission of an enumerated sexual offense. Section 667.7, subdivision (a), provides: "Any person convicted of a felony in which the person [1] inflicted great bodily injury as provided in Section 12022.7, or [2] personally used force which was likely to produce great bodily injury, who has served two or more prior separate prison terms . . . [for specified crimes] . . . is a habitual offender and shall be punished as follows . . . ." As to each count, the People alleged that defendant "personally inflicted great bodily injury upon [M.] within the meaning of Section 12022.8 of the Penal Code" and that defendant "did personally use force upon [M.], which was likely to produce great bodily injury."

At trial, the People agreed with the defense position that imposition of an enhancement under section 12022.7 for the infliction of great bodily injury requires a finding of specific intent. The court so instructed the jury with regard to the enhancement under section 12022.8. The People maintained, however, that clause [2] in section 667.7, subdivision (a)—"or personally used force which was likely to produce great bodily injury"—required only general intent. Calling it "an appellate issue," the trial court adopted the People's approach and instructed the jury that imposition of the section 667.7, subdivision (a), enhancement required a finding of only general intent. Defendant challenges this instruction.

On appeal, the People do not concede that section 12022.7 requires a finding of specific intent, citing a split of authority within the Court of Appeal. But the People contend that, even if section 12022.7 does require specific intent, clause [2] in section 667.7, subdivision (a), charged in this case, requires only general intent. The People rely upon the language of the statute itself, arguing that if the Legislature had intended to require specific intent, it would have included intent language in clause [2], similar to the wording of section 12022.7, which is incorporated into clause [1] of section 667.7, subdivision (a). Moreover, the People argue, requiring only general intent under clause [2] of section 667.7, subdivision (a), is in keeping with the legislative intent to deal with recidivists in a harsher manner. (See *Rummel* v. *Estelle* (1980) 445 U.S. 263, 276 [63 L.Ed.2d 382, 392, 100 S.Ct. 1133].)

Like the People, we believe that the language of the statute is key. But we disagree with the People's conclusion that general intent is sufficient under clause [2] of section 667.7, subdivision (a). We hold that the imposition of an enhancement under section 667.7, subdivision (a), requires a finding of specific intent and that the trial court erred in instructing the jury otherwise.

" '[A] statute must be read and considered as a whole, in order that the true legislative intention may be determined. All the parts of a statute must be construed together, and harmonized, so far as it is possible to do so without doing violence to the language or to the spirit and purpose of the act, so that the statute may stand in its entirety. For the purpose of harmonizing apparently conflicting clauses, each should be read with direct reference to every other which relates to the same subject, and so read, if possible, as to avoid repugnancy.' " (*People* v. *Moroney* (1944) 24 Cal.2d 638, 642, quoting 23 Cal.Jur. 760 [150 P.2d 888].)

In determining the intent required under section 667.7, subdivision (a), we must read the alternative grounds for imposition of the en-

hancement with direct reference to one another. Again, the alternative grounds are [1] defendant is convicted of a felony in which he inflicted great bodily injury as provided in section 12022.7, or [2] defendant is convicted of a felony in which he personally used force likely to produce great bodily injury.

Of necessity, our inquiry must turn upon the degree of intent required under section 12022.7 because if clause [1] requires specific intent, it would be inharmonious to require only general intent under clause [2]. Such a construction could produce the following result: Defendant A pummels X. X sustains great bodily injury. Defendant B pummels Y with equal force. Y does not sustain great bodily injury. Under clause [2], the section 667.7, subdivision (a) enhancement can be imposed on defendant B upon a finding of only general intent, although his victim did not suffer great bodily injury. Under clause [1], the section 667.7, subdivision (a) enhancement may be imposed on defendant A, whose victim was egregiously injured, only by application of the more stringent, specific intent standard. The result would be that prosecutors would not bother with clause [1] at all. Presumably, a defendant who actually causes great bodily injury will invariably have a general intent to perform the acts that constitute force likely to produce such injury. Why bother with specific intent under clause [1] if clause [2] requires only general intent, if defendant's acts also satisfy clause [2], and if the enhancement is the same? To avoid this absurd result, clause [2] necessarily requires specific intent if clause [1] does.

Although the appellate districts have agreed that section 12022.7 requires "specific intent," they have disagreed as to precisely what that means. In *People* v. *Bass* (1983) 147 Cal.App.3d 448 [195 Cal.Rptr. 153], the Second Appellate District focused on the word "inflict." Consulting two dictionaries, the court noted that "inflict" is defined as "to lay (a blow) on" and "to cause or carry out by physical assault or other aggressive action." From these definitions, the court concluded that the "intent to inflict great bodily injury" is "merely the intent to commit a violent act or the intent to commit a battery which is required for assault, and the intent requirement of section 12022.7 is met when such injury is caused by the deliberate act of the defendant, and not accidentally." (*Id.* at p. 454.) Citing *Bass*, the Fourth Appellate District adopted the same view of the section 12022.7 intent requirement in *People* v. *Martinez* (1985) 171 Cal.App.3d 727 [217 Cal.Rptr. 546].

More recent cases have rejected the *Bass* analysis. In *People* v. *Simpson* (1987) 192 Cal.App.3d 1360, 1367 [237 Cal.Rptr. 910], the First Appellate District reasoned: "The fact that the word 'inflict' connotes causation by a particular means does not convert the requirement that the defendants have

*intended to cause* great bodily injury into a mere requirement of 'intent to commit an act' which happens to cause great bodily injury. [¶] The plain meaning of section 12022.7 is that the defendant must have intended to cause great bodily injury. The *Bass* court's construction of the statute to require only a general intent to commit a violent assault violates the rule that ' "[w]hen statutory language is . . . clear and unambiguous there is no need for construction, and courts should not indulge in it." ' [Citation.]" The Fifth Appellate District approved the *Simpson* analysis in *People* v. *Phillips* (1989) 208 Cal.App.3d 1120 [256 Cal.Rptr. 654].

In short, under the *Bass* and *Martinez* view of section 12022.7, the defendant must intend to do only the act causing the great bodily injury. Under *Simpson* and *Phillips*, the defendant must intend to do not just the act causing the injury but the great bodily injury itself. We believe that *Simpson* and *Phillips* were correctly decided. Although the *Bass* court purported to define the specific intent required under section 12022.7, the court adopted a standard that is a classic formulation of general intent. (See *People* v. *Hood* (1969) 1 Cal.3d 444, 456-457 [82 Cal.Rptr. 618, 462 P.2d 370] ["When the definition of a crime consists of only the description of a particular act, without reference to intent to do a further act or achieve a future consequence, we ask whether the defendant intended to do the proscribed act. This intention is deemed to be a general criminal intent."].)

Like the *Simpson* court, we regard the language of the statute as clear and unambiguous. Unlike the *Bass* court, we do not choose to focus on the word "inflict" alone. Rather, we view the entire phrase, "with the intent to inflict such injury," as critical. The required intent is not simply "to inflict"; it is "to inflict *such injury*." The necessary intent is linked to the end result and not merely to the act that brings about that result. We hold that section 12022.7—and, therefore, clause [1] of section 667.7, subdivision (a)—requires specific intent.

Thus, we also hold that clause [2] of section 667.7, subdivision (a) requires specific intent. In drafting this habitual offender statute, the Legislature did, in fact, establish a harsher penalty for recidivists. The statute provides for an enhancement not only in the event of great bodily injury but also in the event of force likely to produce such injury. But in either event, specific intent to produce great bodily injury is required, whether or not such injury actually results.

The People argue that even if the instruction on section 667.7, subdivision (a) was error, "the error was harmless. The evidence showed that [defendant] hit [M.] about her head more than three times using his fist. [M.] was hit in the eye. [Defendant] pulled his fist back to his shoulder

before striking, and he struck his blows in rapid succession. The impact of the blows could be heard. As [the doctor for the prosecution] testified, a blow to the head with extreme force can cause brain damage, or a blow to the eye can cause internal bleeding in the eye. The evidence was sufficient to establish that [defendant] struck [M.] with the intent to produce great bodily injury."

The problem with the People's argument is that it assumes that the initial altercation on M.'s bed was integrally related to the sexual offenses. As we discussed above, that may be a reasonable interpretation of the evidence, but the jury did not necessarily view it that way. Their questions to the court indicate that they put the initial battery aside in reaching a verdict on the counts. The seven counts all required a finding of "force, violence, duress, menace, or fear of immediate and unlawful bodily injury . . . ." (§§ 288, subd. (b); 288a, subd. (c); 289, subd. (a).) The jury may well have believed that defendant's verbal threats, aside from the initial battery, satisfied the force requirement under the crimes charged. Clause [2] of section 667.7, subdivision (a), concerns "[a]ny person convicted of *a felony in which* the person . . . personally used force which was likely to produce great bodily injury . . . ." (Italics added.) Thus, the force must occur during the felony. While the jury may have concluded that defendant had a general intent to perform acts constituting force likely to produce great bodily injury during the commission of the sexual offenses, we cannot say beyond a reasonable doubt that defendant had a specific intent to produce such injury.

*Response to Jury Questions*

As noted above, the jury posed two written questions to the court: "Was the initial assault of [M.] considered to be an act which occurred *during the commission* of the offenses charged, or, since it was chronologically *before* any of the actual offenses/counts, would it not qualify as part of the 'commission' of the crimes? Can we consider this in the voting on the enhanced allegation of inflicting great bodily injury?" The court answered: "That is the question for you to decide." The foreman said, "That's what we thought," but another juror asked, "There is no definition of commission in, I mean isn't there a definition of commission?" The court responded: "I gave you all the instructions here. That's the question. It is a very good question. It is yours, however, to decide."

Defendant argues that the trial court's "[f]ailure to correctly answer the jury question whether the initial forcible episode occurring chronologically before any of the actual offenses qualified for the section 667.7 finding was reversible error and further violated United States Constitution, Sixth and

Fourteenth amendments." The jury's second question suggests to us a concern centered not on section 667.7, subdivision (a), as defendant suggests, but on section 12022.8. In any event, the issue would appear to be moot since defendant prevailed on the section 12022.8 enhancement and we have reversed the jury finding regarding the section 667.7, subdivision (a), enhancement. Nonetheless, we conclude it was not error for the trial court to instruct the jury that it was within their province to answer the questions posed.

Defendant maintains that "[t]he simple and precise answer to the jury's question was no, the initial episode of force chronologically occurring before any of the actual felony offenses' commission would not qualify." But the trial court may instruct the jury only on the law. Under section 1093, subdivision (f), the court shall charge the jury "on *any points of law* pertinent to the issue . . . . At the beginning of the trial or from time to time during the trial, and without any request from either party, the trial judge may give the jury *such instructions on the law* applicable to the case as the judge may deem necessary for their guidance on hearing the case. . . ." (Italics added.) Section 1127 provides in part: "In charging the jury the court may instruct the jury regarding the *law applicable* to the facts of the case . . . . Either party may present to the court *any written charge on the law, but not with respect to matters of fact,* and request that it be given." (Italics added.)

The jury's questions in this case sought factual, rather than legal, instruction. Their questions indicated they already understood that imposition of the enhancements depended upon a concurrence of the sexual offenses with the force likely to produce or actually producing great bodily injury. In this case, where the altercation occurred within minutes of the charged offenses, it was a factual question whether the necessary concurrence was present.

### III. Sentencing

The trial court sentenced defendant to a total of 37 years on the counts. In addition, the court stated that "we have a life term to be imposed pursuant to [section 667.7, subdivision (a)(1)] because of the likelihood that there was force likely to produce great bodily injury. So it would be thirty-seven years plus a life term that I impose." Defendant argues that the sentence should be modified to 37 years to life, with a 20-year minimum parole release eligibility, pursuant to section 667.7, subdivision (a)(1). Because we reverse the jury finding on the section 667.7, subdivision (a) enhancement, we need not review defendant's sentence under that statute.

## DISPOSITION

The judgment of conviction is affirmed. The finding of habitual offender status is reversed. The sentence imposed is vacated. The cause is remanded to the trial court.

Premo, Acting P. J., and Cottle, J., concurred.

A petition for a rehearing was denied August 15, 1990.