[No. B044491. Second Dist., Div. Three. Mar. 15, 1991.]

In re SERGIO R. et al., Minors.
THE PEOPLE, Plaintiff and Respondent, v.
SERGIO R. et al., Defendants and Appellants.

**[Opinion certified for partial publication.\*]**

* Pursuant to California Rules of Court, rule 976.1, this opinion is certified for partial publication. See footnotes 2 and 4, *post*.

**COUNSEL**

R. Charles Johnson and Jeffrey J. Stuetz, under appointments by the Court of Appeal, for Defendants and Appellants.

John K. Van de Kamp and Daniel E. Lungren, Attorneys General, Richard B. Iglehart, Chief Assistant Attorney General, Edward T. Fogel, Jr., Assistant Attorney General, Noreen F. Berra and Leslie P. McElroy, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**DANIELSON, J.**—Sergio R. (Sergio) and Leonardo R. (Leonardo) appeal from orders of the juvenile court sustaining the respective petitions filed against them arising from a drive-by shooting.

Except for modification of the sentence as to Leonardo, we affirm the orders in their entirety.

### FACTUAL STATEMENT

On the evening of February 24, 1989, a conflict took place between the Burlington Locos and the Crazy Riders, a rival gang, over some graffiti. "Shy Boy," a Burlington Locos member, was injured by the Crazy Riders. Afterwards, members of the Burlington Locos, including Leonardo and Sergio, whose gang moniker was "Devil," met at Toberman Park to plan a drive-by shooting. It was decided that the attack would take place at 1831 to 1833 South Orchard where they believed Crazy Riders congregated.

In furtherance of the plan the Burlington Locos stole a red Camaro and retrieved two loaded shotguns from a hiding place in a nearby alley. Four of the gang, including Leonardo and Sergio, were in the Camaro as it proceeded north along Orchard. Leonardo, whose earlier request to be a shooter was denied, pointed out a group of Crazy Riders standing in front of 1831 South Orchard. The vehicle then made a U-turn and proceeded southbound.

Shots were fired from the Camaro, which was momentarily stopped. Sergio, who was in the right rear of the vehicle, fired three rounds from a twelve-gauge shotgun into the group. Another person, in the front passenger seat also fired toward the group.

After driving away, the occupants of the Camaro discussed driving by again for more shooting. Leonardo, who expressed his disappointment that there had been apparently no casualties, directed the driver to return to the scene. After deciding it was too risky, they drove back to their own neighborhood and disposed of the Camaro and shotguns. Later, Sergio, Leonardo, and other fellow gang members had a party at a beach near Santa Monica.

The attack took place on February 25, 1989, about 9 to 9:30 p.m. Although no Crazy Riders were injured or killed, one 11-year-old bystander, Jasmine Guevara, was killed and another bystander, the girl's aunt, Blanca

Guevara, was seriously injured as the result of the attack. Another bystander, Melda Guevara, Jasmine's sister, was not injured.

## PROCEDURAL STATEMENT

### I. *Proceedings as to Sergio*

Counts I through V, respectively, of an amended petition alleged that Sergio committed the offenses of (1) murder in violation of Penal Code section 187;[1] (2) attempted murder (§§ 187/664); (3) unlawful discharge of firearm from a motor vehicle (§ 12034, subd. (c)); (4) assault with a deadly weapon (§ 245, subd. (a)(2)); and (5) conspiracy to commit murder, assault with a deadly weapon and drive-by shooting (§§ 187, 245, 12034, subd. (c)).

The petition also alleged that Sergio personally used a firearm during the commission of the offenses alleged in counts I, II and V (§ 12022.5, subd. (a)) and that he had inflicted great bodily injury as the result of discharging a firearm from a motor vehicle during the commission of the count I and II offenses (§ 12022.55). It was further alleged that Sergio personally inflicted great bodily injury with regard to the offense alleged in count III (§ 12022.7).

Following a hearing on the petition, the court sustained the petition as to all counts and found the offenses involved to be felonies. The court also found the murder and attempted murder offenses to be in the first degree.

The court declared Sergio to be a ward of the court. He was sentenced to the term of 25 years to life as to count I (first degree murder). Sergio was sentenced to a term of life on count II (attempted murder). The additional five-year enhancements imposed pursuant to section 12022.55 as to counts I and II were ordered merged with the sentences on those counts. The sentence as to count III and the enhancement under section 12022.7 were ordered merged with the sentence imposed on count I. The sentence imposed on count IV was ordered merged with the sentence on count II while the sentence on count V was ordered merged with the sentences on counts I and II. Sergio was then ordered to the California Youth Authority (CYA) for a period not to exceed 30 years to life.

---

[1] All section references are to the Penal Code unless otherwise indicated.

## II. *Proceedings as to Leonardo*[2]

. . . . . . . . . . . . . . . . . . . . .

SERGIO'S APPEAL

### A. ISSUES RAISED

Sergio contends: (1) the court committed reversible error by basing its findings of first degree murder and attempted murder on the theory of implied malice; (2) the finding of first degree murder is not supported by the evidence; (3) a finding of second degree murder would not be supported by the evidence; (4) reversal of the finding of assault with a deadly weapon is mandated because the court already found that he discharged a firearm from a vehicle; (5) the failure of the court to find the enhancement allegations to be true mandates the striking of the enhancements; (6) alternatively, insufficient evidence supports the findings that the 12022.55 and 12022.7 enhancement allegations were true; and (7) the court abused its discretion by committing him to CYA without having first found less restrictive alternatives to be ineffective.

### B. DISCUSSION

### I. *Findings of First Degree Murder and Attempted Murder*

■ Murder of the first degree necessitates a finding of express malice on the part of the perpetrator. (*People* v. *Knapp* (1886) 71 Cal. 1, 6 [11 P. 793].) The offense of attempted murder also requires a finding of express malice. (*People* v. *Lee* (1987) 43 Cal.3d 666, 670 [238 Cal.Rptr. 406, 738 P.2d 752].) Express malice consists of a specific intent to kill, i.e., "when there is manifested a deliberate intention unlawfully to take away the life of a fellow creature." (§ 188.)

■ Sergio argues that the court impermissibly based its findings of first degree murder and attempted murder on the theory of implied malice, and thus, those findings must be reversed.

We disagree.

The prosecutor argued that "based upon the planning activity against the rival gang that there was clearly an intent to kill, which is eviden[ced] by

---

[2]That portion of the opinion under the heading "II. Proceedings as to Leonardo" is not for publication.

the fact that these minors armed themselves with shotguns, came by at close range, even swung the car around, made a U-turn so that they could get closer and just fired indiscriminately at this crowd of people." He further argued that this was not simply a case of "assault with a deadly weapon. Assault with a deadly weapon is if they wanted to drive-by and scare them with cap guns or shooting a shotgun up in the air."

The court implicitly found the requisite specific intent by finding that the drive-by shooting here was "a crime of shooting at somebody with a shotgun" and that Sergio and Leonardo "both had knowledge of what was going to happen," i.e., someone would be killed.

Although the intended victims were members of the rival Crazy Riders gang, the court impliedly found that the specific intent to kill them was transferred to the actual victims. The court explained: "Unfortunately, as too often happens today in Los Angeles County an innocent person gets in the way. In the case of . . . [People v.] Orabuena, 56 Cal.[App.3d] 540 [128 Cal.Rptr. 474], a person . . . was in a group behind some bushes, and he ends up dead."

A plain reading of the record reveals that the court was discussing the elements of implied malice solely with regard to the issue of transferred intent. In other words, the court was responding to Sergio's argument that he never intended to hurt anyone, that he did not "see the little girl, and he didn't see nobody [sic] fall" and to Leonardo's argument that "they didn't even know that they had hit somebody" and the girl's death was basically an accident in that it "occurred in the commission of a reckless act; namely, shooting or discharging a gun in public" rather than from an intent to hurt or kill anyone.

The court responded: "We have an intentional act. The act is getting in that car, guns shooting in the direction of a group . . . . The natural and foreseeable consequences in that act, the shooting with a shotgun, not a .22, not a BB gun, they're shooting with a shotgun. Shotguns are highly dangerous weapons. Natural and probable consequences of that act are that somebody is either going to get hurt or get killed. [¶] The act was deliberately performed with knowledge of danger to and with a conscious disregard for life . . . . There's a conscious disregard for anything. They're pointing a shotgun; two people with shotguns going by and shooting."

In essence, the point the court was making inarticulately was their cognizance, or lack thereof, of the victims' existence did not change the fact that they intended to kill since they did not care who would be killed by their actions, which exhibited a conscious disregard for life in general.

II. *Sufficiency of Evidence to Establish First Degree Murder*

▇▇▇ Sergio next contends that the finding of first degree murder must be reversed, because there is insufficient evidence to establish either express malice or premeditation and deliberation.

Based on our review of the record we find ample evidence to support those elements. As set forth, *ante*, express malice is the intent to kill. In the present case the evidence shows that Sergio and Leonardo planned to do a drive-by retaliatory shooting at a rival gang in a specific location and participated in the carrying out of that plan which involved the obtaining and loading of two 12-gauge shotguns, the locating of rival gang members, the maneuvering of the vehicle in close proximity to those members, and the firing of the shotguns at the members. After driving away, the only reason the conspirators did not return to repeat the shooting was the risks involved. The fact that killing was intended was evidenced also by Leonardo's expressed disappointment that they had inflicted no apparent casualties.

▇▇▇ The record also contains sufficient evidence to support the implied findings of premeditation and deliberation, which require the consideration of three factors: (1) the accused's behavior evidencing the planning of the killing; (2) facts concerning a prior relationship between the accused and the victims from which a motive for killing could be inferred; and (3) facts about the manner of the killing which would give rise to an inference that the killing took place according to a preconceived plan. (See, e.g., *People* v. *Lucero* (1988) 44 Cal.3d 1006, 1018-1020 [245 Cal.Rptr. 185, 750 P.2d 1342].)

▇▇▇ Here, the motive was apparent. The purpose of the drive-by shooting was to retaliate for an earlier injury sustained by Shy Boy, a member of the drive-by gang. The fact that the victims were innocent bystanders is of no legal import. (See, e.g., *People* v. *Flores* (1986) 178 Cal.App.3d 74, 80-81 [223 Cal.Rptr. 465].) Prior planning was also evident. Members of the drive-by gang met at Toberman Park to discuss the details of the attack. A Camaro was stolen and two shotguns were obtained and loaded expressly for the drive-by shooting. Lastly, the manner of the killing was consistent with the preconceived plan. They drove to the predesignated location. Leonardo, whose assignment was that of spotter, pointed out the group of Crazy Riders. The driver maneuvered the vehicle to close proximity of the Crazy Riders and then stopped. The designated shooters fired the shotguns at the Crazy Riders.

III. *Sufficiency of Evidence to Support Finding of Second Degree Murder*

Our conclusion that there was ample evidence to support the court's finding of murder in the first degree renders Sergio's contentions in this regard moot.

IV. *Findings of Assault with Deadly Weapon and Discharge of a Firearm from a Vehicle*

■ Sergio contends that the finding of assault with a deadly weapon must be reversed because it is duplicative of the finding that he discharged a firearm from a vehicle.

We disagree. We hold that where, as here, different victims are involved a defendant may be punished for both assault with a deadly weapon (§ 245, subd. (a)(2)) and discharging a firearm from a motor vehicle (§ 12034, subd. (c)). (See, e.g., *People* v. *Masters* (1987) 195 Cal.App.3d 1124, 1127-1130 [241 Cal.Rptr. 511] [held: different victims justify punishment for both assault with a deadly weapon (§ 245, subd. (a)(2)) and discharging a firearm at an occupied motor vehicle (§ 246)].)

In the present case Blanca was the only victim with regard to the assault with a deadly weapon finding. The discharge of a firearm from a motor vehicle finding on the other hand was not victim specific; rather, it pertained to all the victims, Blanca and Jasmine, as well as Melda Guevara, who was present but not injured. (See *Masters, supra,* 195 Cal.App.3d at p. 1128.)

V. *Imposition of Enhancements*

■ Sergio asserts that all the enhancements must be stricken, because the court failed to making specific findings that they were true.

From our review of the record we conclude that the court made the requisite findings to justify the imposition of the enhancements. Here, the court made the specific factual findings that Sergio and another Burlington Locos gang member were armed with shotguns, that they fired into a group of people, and that as the result, one innocent bystander was killed and another seriously injured. The court concluded that the "[p]etition is sustained as to all counts in the first degree." These findings are sufficient since there is no express requirement that the court make particular findings as to each enhancement allegation in a juvenile petition. (See, Cal. Rules of Court, former rule 1355, subd. (f); Welf. & Inst. Code, § 702; see also *In re Billy M.* (1983) 139 Cal.App.3d 973, 980-981 [189 Cal.Rptr. 270].)

Moreover, the recitals in the clerk's transcripts of the proceedings on August 2, 1989, reflect that the court found the enhancements to be true.

## VI. *Sufficiency of Evidence to Support Enhancements Under Sections 12022.7 and 12022.55*

■ Sergio contends that, assuming arguendo the enhancements were found to be true, the enhancements based on sections 12022.55 and 12022.7[3] must be vacated for lack of evidence to support them. He argues that there was no evidence to show he had the intent to inflict great bodily injury or that his personal conduct of discharging a firearm resulted in death or great bodily injury. His contentions are without merit.

### a. *The Intent to Inflict Great Bodily Injury*

■ Initially, we note that the phrase "intent to inflict great bodily injury" in section 12022.55 has not yet been judicially construed in a published opinion. However, on its face section 12022.55 refers to section 12022.7 for the definition of "great bodily injury." It is therefore apparent, and we hold, that the phrase "intent to inflict great bodily injury" in section 12022.55 has the same meaning as it has in section 12022.7.

The law is not settled as to what is necessary to establish the intent which is required to invoke the prison term enhancement provided for in section 12022.7. Our Supreme Court has not yet addressed the issue, and the Courts of Appeal have taken differing positions on the question. Although all agree that the specific intent to inflict great bodily injury is required (see, e.g., *People* v. *Bass* (1983) 147 Cal.App.3d 448, 454 [195 Cal.Rptr. 153]; *People* v. *Simpson* (1987) 192 Cal.App.3d 1360, 1365-1366 [237 Cal.Rptr. 910]), the courts have not agreed on what must be proven to meet that

---

[3] Section 12022.55 provides in pertinent part:

"[A]ny person who, with the intent to inflict great bodily injury or death, inflicts great bodily injury, as defined in Section 12022.7, or causes the death of a person, other than an occupant of a motor vehicle, as a result of discharging a firearm from a motor vehicle in the commission of a felony or attempted felony, shall, upon conviction of the felony or attempted felony, in addition and consecutive to the punishment prescribed for the felony or attempted felony of which he or she has been convicted, be punished by an additional term of imprisonment in the state prison for five years."

Section 12022.7 provides in pertinent part:

"Any person who, with the intent to inflict such injury, personally inflicts great bodily injury on any person . . . shall, in addition and consecutive to the punishment prescribed for the felony or attempted felony of which he has been convicted, be punished by an additional term of three years, unless infliction of great bodily injury is an element of the offense of which he is convicted.

"As used in this section, great bodily injury means a significant or substantial physical injury."

requirement, i.e., does the intent to commit the act which in turn causes the injury suffice, or is it necessary to prove that in committing that act the defendant also had the intent to inflict great bodily injury upon the victim?

In *People* v. *Bass, supra,* 147 Cal.App.3d 448, at page 454, the court held: "[T]he 'intent to inflict great bodily injury' is merely the intent to commit a violent act or the intent to commit a battery which is required for assault, and the intent requirement of section 12022.7 is met when such injury is caused by the deliberate act of the defendant, and not accidentally."

In contrast, the court in *People* v. *Simpson, supra,* 192 Cal.App.3d 1360, at page 1367 held: "The plain meaning of section 12022.7 is that the defendant must have intended to cause great bodily injury." The *Simpson* court criticized the *Bass* court's construction of section 12022.7 as requiring "only a general intent to commit a violent assault," which construction violated the settled legal principle that courts should not indulge in statutory construction when the statutory language is clear and unambiguous. After noting that "[b]y the *Bass* court's own definition, the word 'inflict' means 'to cause,'" the *Simpson* court pointed out that "[t]he fact that the word 'inflict' connotes causation by a particular means does not convert the requirement that the defendants have *intended to cause* great bodily injury into a mere requirement of 'intent to commit an act' which happens to cause great bodily injury." (*Ibid.*, italics in original.) The *Simpson* case reached the correct result.

We find that the *Bass* court failed fully to appreciate the meaning of the word "inflict." The opinion in *Bass* defines the word "inflict," as being "to lay (a blow) on," or "to cause or carry out," etc. *Bass* then leaps to the conclusion: "Thus, the 'intent to inflict great bodily injury' is merely the intent to commit a violent act . . . , and the intent requirement of section 12022.7 is met when [the] injury is caused by the deliberate act of the defendant, and not accidentally." (*Bass, supra,* 147 Cal.App.3d at p. 454.)

Certainly, the defendant's act must be intentional, rather than accidental, but the definition of "inflict" in *Bass* does not go far enough. "Inflict" is a verb which requires an object. Thus, the definition of "inflict" in Webster's, "to lay (a blow) on: cause (something damaging or painful) to be endured: IMPOSE . . ." (Webster's New Internat. Dict. (3d ed. 1981) p. 1160) requires that there be an object of the described action. The statutes specify that object: "a person," in section 12022.55; "on any person," in section 12022.7.

In order to invoke the enhancements of section 12022.7 or 12022.55, it is not enough to prove only that the defendant intentionally set the injury-causing force in motion; it is also necessary to prove that in doing so the defendant intended to inflict the great bodily injury on a person.

Thus, we hold that in order to invoke the enhancements based upon "intent to inflict great bodily injury" provided for in sections 12022.7 and 12022.55 it is necessary to prove that the defendant had the intent to do the act which caused a person to suffer great bodily injury, coupled with the specific intent to inflict such injury upon a person. (See also, *People* v. *Phillips* (1989) 208 Cal.App.3d 1120, 1123-1124 [256 Cal.Rptr. 654]; *People* v. *Santos* (1990) 222 Cal.App.3d 723, 742-744 [271 Cal.Rptr. 811].)

b. *Proof of the Intent*

The intent to inflict great bodily injury need not be proven by direct evidence. Such intent may be inferred or presumed. " 'It is black-letter law that a party is presumed to intend to do that which he voluntarily or willfully does in fact do and also presumed to intend the natural, probable and usual consequences of his own acts.' (*People* v. *Johnson* (1980) 104 Cal.App.3d 598, 610-611 [164 Cal.Rptr. 69] . . . .) Thus, ' "[w]here one assaults another violently with a deadly weapon and takes his life the presumption is that the assailant intended death or great bodily harm. [Citation.] And where . . . the assault was made in a manner that was reasonably certain to produce death, and which actually did cause death, the only rational presumption to be drawn therefrom is that the assailant intended to take the life of the person [assaulted.]" ' [Citations.]" (*People* v. *Phillips, supra,* 208 Cal.App.3d 1120, 1124.)

In this case, the fact that Sergio fired a loaded 12-gauge shotgun a number of times into a group of people at close proximity evidences the requisite "intent to inflict great bodily injury." The existence of this intent does not cease because the wrong person was the victim. (See, e.g., *People* v. *Flores, supra,* 178 Cal.App. 3d 74, 80-81.)

Sergio next argues that there was insufficient evidence to show that he personally inflicted great bodily injury or death on the victims. He claims that the evidence did not show that his discharge of the shotgun, which involved three rounds, as contrasted with the discharge of the shotgun of his fellow gang member, was the cause of the great bodily injury and death suffered by the victims.

We reject his contentions as meritless. We hold that where, as here, more than one assailant discharges a firearm into a group of people and "it is not

possible to determine which assailant inflicted which injuries, the defendant may be punished with a great bodily injury enhancement if his conduct was of a nature that it could have caused the great bodily injury suffered." (*People* v. *Corona* (1989) 213 Cal.App.3d 589, 594 [261 Cal.Rptr. 765].) It is beyond dispute that the discharge of a loaded 12-gauge shotgun by Sergio into a crowd of people was the type of conduct which could have caused the great bodily injury and death here which resulted from shotgun pellets.

## VII.  *Commitment of Sergio to CYA*

■  Sergio's remaining complaint concerns his commitment to the CYA. He argues this was an abuse of discretion since the record does not indicate that less restrictive alternatives would have been ineffective.

From our review of the record we find no abuse of discretion. In this regard, Sergio's prior criminal history, the facts of this case, and his personal and social conduct provide ample support for the trial court's express finding that no less restrictive alternatives would have been feasible.

His prior history indicated a pattern of delinquent behavior which evidenced a progression towards serious and violent felonies. At 13, Sergio was involved in vandalism. By 15, he was involved in the more serious offenses of possession, manufacture and sale of dangerous weapons. A month later, he committed the subject offenses, which included murder and attempted murder.

The instant incident reveals Sergio's extreme social dysfunction: He participated in the planning and execution of a retaliatory drive-by shooting against a rival gang in which one innocent bystander was killed and another seriously injured. In furtherance of this assault, a car was stolen and Sergio himself fired a loaded 12-gauge shotgun into a crowd of people.

Moreover, the record also discloses the fact that Sergio was not merely a "wannabe" or newly affiliated gang member. Instead, at fifteen, he was an active gang member whose moniker was "Devil" and whose deep involvement in the gang was evidenced by the fact that he was chosen as one of the two shooters in the incident.

## LEONARDO'S APPEAL[4]

.   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .

---

[4] That portion of the opinion under the heading "LEONARDO'S APPEAL" is not for publication.

## DECISION

The orders are affirmed, except the sentence as to Leonardo is modified to reflect that the sentence on the assault with a deadly weapon finding is stayed.

Klein, P. J., and Croskey, J., concurred.

Appellants' petition for review by the Supreme Court was denied June 4, 1991.