[No. D011884. Fourth Dist., Div. One. Mar. 10, 1992.]

THE PEOPLE, Plaintiff and Respondent, v.
LARRY DOMINGUEZ, Defendant and Appellant.

**[Opinion certified for partial publication.*]**

*Pursuant to California Rules of Court, rule 976.1, this opinion is certified for publication with the exception of parts II through V.

**COUNSEL**

Joyce P. Meisner, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Harley D. Mayfield, Assistant Attorney General, and Karl T. Terp, Deputy Attorney General, for Plaintiff and Respondent.

**OPINION**

**TODD, Acting P. J.**—A jury convicted Larry Dominguez of two counts of attempted murder (Pen. Code,[2] §§ 664, 187), fixing the degree in one count as first degree and as second degree in the other count. These counts stem from two different incidents. With respect to each of the attempted murder

---

[2] All statutory references are to the Penal Code unless otherwise specified.

counts, the jury also found true allegations Dominguez personally used a firearm in committing the offense within the meaning of section 12022.5, subdivision (a), and intended to and did personally inflict great bodily injury upon the victim within the meaning of section 12022.7. With respect to the count for which he was convicted of attempted murder in the second degree, the jury found true an additional allegation that Dominguez intended to and did inflict great bodily injury as a result of discharging a firearm from a motor vehicle within the meaning of section 12022.55. The jury also found Dominguez guilty of one count of assault with a firearm. (§ 245, subd. (a)(2).) This count stemmed from the same incident as the count for which Dominguez was convicted of attempted murder in the first degree. With respect to the assault count, the jury found true an allegation Dominguez personally used a firearm in committing the offense. (§ 12022.5, subd. (a).) Finally, the jury convicted Dominguez of one count of having a concealed firearm on his person (§ 12025, subd. (b)); this count stemmed from his possession of a gun on the day he was arrested.

The trial court sentenced Dominguez to the aggravated term of nine years for the conviction of attempted murder in the second degree, plus an additional enhancement of five years under section 12022.55. Pursuant to section 654, the trial court stayed the enhancements under sections 12022.5, subdivision (a), and 12022.7. As for the conviction of attempted murder in the first degree, the trial court imposed a life term with possibility of parole to run consecutive to the sentence for the other attempted murder count. Additionally, on this count, the trial court imposed consecutive enhancements of two years for the section 12022.5 allegation and three years for the section 12022.7 allegation. On the assault count, the trial court stayed the sentence. Finally, on the firearm possession count, the trial court imposed a four-month sentence. Hence, in sum, Dominguez was sentenced to a total of five years to life, consecutive to fourteen years and four months.

On appeal, Dominguez contends (1) his conviction of attempted murder in the first degree cannot stand because the jury was not given correct verdict forms, (2) the evidence was insufficient to establish he acted willfully, deliberately and with premeditation, (3) the trial court abused its discretion by failing to sever the first count (the count for which he was convicted of attempted murder in the second degree) from the remaining counts, (4) the prosecutor committed misconduct by improperly questioning certain witnesses about gang activity, and (5) the cumulative effect of the failure to sever and the prosecutorial misconduct requires reversal of two convictions (attempted murder in the first degree and assault with a firearm).

FACTS

On August 3, 1989, at approximately 12:30 a.m., Jonathan Ruiz, 14, was shot in the stomach in front of his home at 1046 40th Street in San Diego.

Earlier that evening, Elizabeth Roth, 20, and her 15-month-old son, Antonio Ruiz, had been visiting the residence in which Paul Ruiz, 19, also lived. Paul Ruiz was the boyfriend of Roth, the father of Antonio Ruiz, and the brother of Jonathan Ruiz. Both Paul Ruiz and Jonathan Ruiz "claimed membership" or were members of a gang known as the "Market Street" gang.

During the course of the evening, Roth and Paul Ruiz quarrelled. Roth telephoned her niece, Bobby-Jo, and asked her to come to the Ruiz residence and drive her and the child home. Between 12:30 a.m. and 1 a.m., Bobby-Jo arrived at the Ruiz residence in a blue Monte Carlo driven by her boyfriend, Dominguez; another Hispanic male was also in the vehicle. Roth went outside to make sure it was Bobby-Jo and then returned to the house to retrieve the baby's car seat. Paul Ruiz, who was holding the child in his arms, began arguing with Dominguez, and, when Roth came outside again, he told her she could leave with them but she could not take the child with her. At that point, Dominguez said: "We just came to pick them up." Paul Ruiz told the occupants of the car neither Roth nor their son was going to get into the vehicle, and they should leave. Paul Ruiz then asked them who they were and what gang membership they claimed. Bobby-Jo said they "didn't claim" and Paul Ruiz told her: "Shut the fuck up, bitch." Then, Dominguez said "Vel 69th Street" or "Encanto 69th Street," identifying himself as a member of the Varrio Encantos Locos gang, which is a rival gang to the Market Street gang. Paul Ruiz took this response as a challenge and told the driver if he did not leave, he would "cap" or shoot at the car. Jonathan Ruiz then asked Paul Ruiz what the occupants of the car were saying, and Dominguez said, "Para vel Encanto." When Jonathan Ruiz heard the occupants were members of the rival gang, he said either "Puro Market Street" or "fuck Encanto." Dominguez then pointed a small caliber handgun and shot Jonathan Ruiz in the stomach.[3] Jonathan Ruiz was about 12 feet from the car at the time; he suffered a lacerated liver. Dominguez then drove the car away.

On the evening of August 4, 1989, and the early morning of August 5, 1989, Calvin Smalley and James Yepiz attended a barbecue at Ventura Cove at the east wing of the Bahia Hotel parking lot. Between 1 a.m. and 1:30 a.m., Yepiz and Smalley left the barbecue area in Smalley's truck, with Smalley driving. Before they left the parking area, they heard a large bang that sounded as though a bottle had struck the truck on the passenger side by the wheel well. Smalley stopped the truck and Yepiz jumped out. Yepiz approached a group of three Hispanic males who were closest to the truck and yelled, "What the fuck's going on here? What's the problem?" One of

---

[3]Roth did not see who fired the gun, but she positively identified Dominguez as the driver; other eyewitnesses identified the driver as the one who shot Jonathan Ruiz.

the three Hispanics separated himself from the others by about two to three feet and started approaching Yepiz, who continued to walk toward them. This individual then pulled out a gun, aimed it at Yepiz and started shooting.[4] He shot at Yepiz five to six times. When Yepiz realized he had been shot, he turned and walked back to the truck. Smalley backed up the truck and Yepiz jumped inside. As Smalley was driving away, the shooter continued firing, with one bullet shattering the back window and damaging the windshield of the truck.

Yepiz suffered a collapsed lung and had two bullets embedded in his torso; one beneath his collar bone and one in his left side. These bullets were not removed. Two other bullets entered and exited his body.

On August 7, 1989, San Diego Police Officer Boyd Long was asked to assist in the apprehension of Dominguez, who was a suspect in the August 3 and August 5 shootings. Dominguez and his brother were observed leaving a residence in a car and this information was relayed to Long. Long began following the vehicle with the Dominguez brothers, and a chase ensued. When the brothers' vehicle stopped, Larry Dominguez got out and started running; Long chased him on foot. At one point, Dominguez threw a white T-shirt over a 12-foot fence. Long, pointing a gun, yelled at Dominguez to stop and get down to the ground; Dominguez complied. After another officer arrived and assisted in handcuffing Dominguez, Long searched the other side of the fence and found a white T-shirt and a .22-caliber semiautomatic handgun about three feet away. A ballistic study of the gun as well as the shells found at the Ventura Cove shooting scene showed this gun was the same one used at the Ventura Cove shooting.

Dominguez did not testify. Two of his witnesses, Eileen Villa and Lisa Villa, both of whom knew Dominguez for several months, testified they had been at Ventura Cove the evening of the shooting and did not see Dominguez there.

The jury convicted Dominguez of attempting to murder Jonathan Ruiz and fixed the degree at second degree. The jury convicted Dominguez of attempting to murder Yepiz and fixed the degree at first degree. The jury convicted Dominguez of assaulting Smalley with a firearm.

---

[4]One eyewitness said the shooter said "I'll shoot you" immediately before opening fire. This eyewitness also testified earlier that evening the shooter had approached her group, lifted up his shirt to reveal a gun in his waistband and said: "Just in case something happens." This eyewitness was not able to identify Dominguez in a photographic lineup.

## Discussion

### I

Dominguez contends his conviction of attempted murder with respect to the Ventura Cove incident must be reduced to attempted murder in the second degree because the jury did not specifically find and note on the verdict form that he acted with the requisite willfulness, premeditation and deliberateness required for attempted murder in the first degree. The contention is without merit.

Section 664 provides that a person convicted of attempting to commit willful, deliberate, and premeditated murder shall be punished by imprisonment in the state prison for life with the possibility of parole, but such punishment cannot be imposed unless the fact the attempted murder was willful, deliberate and premeditated is charged in the accusatory pleading[5] and admitted or found to be true by the trier of fact.

CALJIC No. 8.67,[6] which was given to the jury here, discusses the finding of willfulness, deliberateness and premeditation in connection with attempted murder. CALJIC No. 8.67 informs the jury that it must determine whether the allegation that the attempted murder was willful, deliberate and premeditated is true or not true. The instruction goes on to define in some

---

[5] This requirement is not at issue as the information expressly contains the allegation the offense was committed "willfully, deliberately and premeditatedly."

[6] CALJIC No. 8.67 reads: "It is alleged in [Count[s] _____ of the information that the crime attempted was willful, deliberate, and premeditated murder. If you find the defendant guilty of attempt to commit murder, you must determine whether this allegation is true or not true. [¶] 'Willful' means intentional. 'Deliberate' means formed or arrived at or determined upon as a result of careful thought and weighing of considerations for and against the proposed course of action. 'Premeditated' means considered beforehand. [¶] If you find that the attempt to commit murder was preceded and accompanied by a clear, deliberate intent to kill, which was the result of deliberation and premeditation, so that it must have been formed upon pre-existing reflection and not under a sudden heat of passion or other condition precluding the idea of deliberation, it is attempt to commit willful, deliberate, and premeditated murder. [¶] The law does not undertake to measure in units of time the length of the period during which the thought must be pondered before it can ripen into an intent to kill which is truly deliberate and premeditated. The time will vary with different individuals and under varying circumstances. [¶] The true test is not the duration of time, but rather the extent of the reflection. A cold, calculated judgment and decision may be arrived at in a short period of time, but a mere unconsidered and rash impulse, even though it includes an intent to kill, is not deliberation and premeditation. [¶] To constitute willful, deliberate, and premeditated attempt to commit murder, the would-be slayer must weigh and consider the question of killing and the reasons for and against such a choice and, having in mind the consequences, decides to kill and makes a direct but ineffectual act to kill another human being. [¶] The People have the burden of proving the truth of this allegation. If you have a reasonable doubt that it is true, you must find it to be not true. [¶] You will include a special finding on that question in your verdict, using a form that will be supplied for that purpose."

depth the terms willful, deliberate and premeditated. CALJIC No. 8.67 further instructs the jury that the prosecution bears the burden of proving the allegation of willfulness, deliberateness and premeditation and if the jury is not satisfied beyond a reasonable doubt of the truth of the allegation, the jury must find the allegation not true. Finally, the instruction tells the jury it will be supplied with a verdict form that will include a special finding on this issue.

Here, the jury was given this instruction in total,[7] including the part discussing the special finding on the verdict form. However, the jury was not given a verdict form that included a special finding on the issue as discussed in CALJIC No. 8.67.[8] The verdict form that was given to the jury for the attempted murder counts included a part that allowed the jury to fix the degree of the attempted murder as first or second degree.

As we understand the argument on appeal, Dominguez argues it was reversible error *not* to use the special finding verdict contained in the appendix to the CALJIC instructions. Obviously, where as here, the court told the jury that it would be given a form with a special finding on the issue of willfulness, deliberateness and premeditation, it would have been preferable for the court to use such a verdict form. But from that factor alone, we cannot conclude there was error. Dominguez does not refer us to—and our research has not disclosed—any case authority that the suggested special finding form contained in the CALJIC appendix must be used. In fact, the only authority Dominguez relies upon in making this argument is *People* v. *Douglas* (1990) 220 Cal.App.3d 544 [269 Cal. Rptr. 579], which does not focus on the issue of the special finding form, but rather focuses on whether there are separate crimes of first degree attempted murder and second degree attempted murder.

As indicated above, section 664 provides the crime of attempted willful, deliberate and premeditated murder can be punished by a prison term of life with the possibility of parole only if the trier of fact finds that the attempted murder was willful, deliberate and premeditated. It is clear from this record—the version of CALJIC No. 8.67 given, including the reference to

---

[7]The complete text of CALJIC No. 8.67 was given to the jury here with one minor adaptation. After the first sentence of CALJIC No. 8.67, the trial court inserted a sentence defining the crime charged in the information as attempted murder in the first degree. This sentence read: "That is, attempted murder in the first degree."

[8]According to the Use Note for CALJIC No. 8.67 a form contained in appendix A to CALJIC Instructions should be used for the special finding required here. The pertinent form contained in appendix A reads as follows:

"Allegation: The crime of attempt to commit murder of which you have found the defendant guilty was an attempt to commit willful, deliberate and premeditated murder.

"Finding: (Place an 'x' beside the answer to which you unanimously agree.)

"True: _____ .

"Not True: _____ ." (2 CALJIC (5th ed. 1988) appen. A, p. 496.)

attempted first degree murder (see fn. 6, *ante*), and the verdict form used, which left it up to the jury to fix the degree—the jury, by fixing the degree as first degree in count two, found to be true the allegation that Dominguez acted willfully, deliberately and with premeditation in his attempt to murder Yepiz.[9] Thus, the mandate of section 664 was satisfied. This is so even though the special finding form suggested by the authors of CALJIC was not used here. In other words, we do not believe the mandate of section 664 can be met *only* by using the special finding form contained in the CALJIC appendix.

We find Dominguez's reliance on *People* v. *Douglas, supra,* 220 Cal.App.3d 544, unavailing. The case simply is not on point here. At issue in *Douglas* was whether the trial court erred in failing to instruct on second degree murder. In *Douglas,* the Court of Appeal affirmed after analyzing section 664 and concluding there is only a single crime of attempted murder, not separate crimes of attempted first degree murder and attempted second degree. ██ ██ Here, we need not concern ourselves with whether there are two distinct crimes of attempted first degree murder and attempted second degree murder.[10] The issue is whether the jury made the requisite special finding on the allegation of willfulness, deliberateness and premeditation contained in the information. As indicated above, the jury did so by fixing the degree as first degree in accordance with the adapted instruction given.

 We find speculative and totally unpersuasive Dominguez's argument that notes[11] sent to the trial court by the jury during deliberations show that the lack of provision for a special finding on willfulness, deliberation and premeditation confused the jury. The notes, it seems to us, demonstrate, just as likely, if not more so, that at that point in time the jury was

[9]Concomitantly, we note it is clear the jury, by fixing the degree as second in count one, found not true the allegation that Dominguez acted willfully, deliberately and with premeditation in attempting to murder Jonathan Ruiz.

[10]Since it is not necessary for us here to decide whether the *Douglas* court was correct in concluding the crime of attempted murder is not divided into degrees (see generally, 9 Witkin, Cal. Procedure (3d ed. 1985) Appeal, § 255, pp. 261-262), we shall not rule on the issue, the significance of which seems largely one of semantics in this case. In any event, we note since *Douglas* is an opinion by another court of appeal it is not binding on us (see generally, 9 Witkin, *supra,* § 772, pp. 740-742). Finally, we deem it appropriate to make one more observation: *Douglas* was the first published case to declare that the crime of attempted murder is not divided into degrees and *Douglas* was filed in May 1990, several months after Dominguez's trial was held. We doubt the trial court in crafting the instructions given here and making reference to attempted murder in the first degree or second degree should be faulted for not having the prescience to anticipate *Douglas.*

[11]The first note read: "Judge Hammes [¶] If our vote is split between 1st and 2nd degree would the verdict automatically revert to the lesser (i.e.) 2nd degree." The second note read: "Judge Hammes please clarify to the jury the first paragraph of CALJIC 8.75[.] Jury may return partial verdict, as to a hung jury on first degree, may a second degree finding still be made."

numerically divided on the state of evidence and was seeking advice on how to proceed further.

## II-V*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

### DISPOSITION

Affirmed.

Huffman, J., and Froehlich, J., concurred.

Appellant's petition for review by the Supreme Court was denied June 10, 1992.

*See footnote, *ante*, page 516.