[No. A067626. First Dist., Div. Two. June 6, 1996.]

THE PEOPLE, Plaintiff and Respondent, v.
TIMOTHY NEAL BOSTICK, Defendant and Appellant.

**[Opinion certified for partial publication.\*]**

---

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of part I.

288

**COUNSEL**

Nella Bertin, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Ronald A. Bass, Assistant Attorney General, Laurence K. Sullivan and Seth K. Schalit, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**SMITH, J.**—Timothy Neal Bostick was convicted by a jury of voluntary manslaughter, with a special finding that he discharged a firearm from a motor vehicle causing another's death, within the meaning of Penal Code section 12022.55 (all further unspecified statutory references are to the Penal Code). Sentenced to a total term of 11 years in prison, Bostick seeks reversal on the grounds that the trial court prejudicially erred in excluding testimony regarding the victim's use of cocaine and that the jury should have been instructed that the gun enhancement statute contains an implied "drive-by" element. We disagree on both counts and affirm the judgment.

## BACKGROUND

In 1987, Dena Wright (Dena) began a relationship with the victim in this case, Eric Riggins, when she was 14 years old. She moved in with Riggins and gave birth to a son, Jaray, in 1988. During their relationship there were incidents where Dena was subject to severe physical abuse by Riggins, some of which were reported to the police. Riggins would slap her and hit her. He broke her wrist when she was three months pregnant; when she was eight months pregnant he struck her, causing her to fall and hit her head on a nightstand. On another occasion, he threw her against a wall so hard she smashed a hole in it. On a third occasion, in a jealous fit over some flowers a client had sent her, Riggins threw Dena out of a moving car, grabbed her up by the hair and subjected her to more physical abuse for another hour.

The abuse stopped once Dena broke up with Riggins in January 1991. She met Bostick in January 1993 and they developed a romantic relationship. Dena told Bostick about the incidents of abuse at the hands of Riggins.

A week before the shooting, Dena had forgotten to pick up Jaray from child care because she was ill. Riggins showed up at her house and was furious. He demanded to speak to her, followed her out of the car, grabbed her face and slammed it against the car window. Dena told Bostick about the incident.

On December 4, 1993, Riggins walked into Dena's place of work, angry because she had lied to him about Jaray's whereabouts. After a brief

discussion, Riggins grabbed her purse and her pager and walked out. Dena told Bostick what happened and asked him to get her purse back. She also told him that she had called the police. Bostick said that was a good idea, telling her that he "should have checked him [Riggins] last week when he put his hands on your face."

Around 10:30 or 11 a.m. three men working on a truck on 10th Street across from Riggins's mother's house saw a Dodge Stealth, driven by Bostick, pull up in front of the house. Bostick remained in his car. Riggins waved to Bostick and walked up to the driver's side. The men saw Riggins leaning over the car, speaking with Bostick. Riggins did not look angry and he did not have a bulge anywhere in his pockets. There was no yelling, threats or scuffling.

After about five to ten minutes, a shot rang out. Riggins grabbed his shoulder and fell to the ground, yelling, "I've been shot." Bostick drove away, smiling. Later, he told Dena that he had "popped" Riggins. He gave the gun to a friend and told him to dispose of it. No weapons were found on Riggins or in the vicinity.

Bostick testified about his relationship with Dena in which she told him about Riggins's quick temper and the upsetting incidents of past abuse. Riggins and Bostick had two confrontations prior to the shooting and they had threatened each other several times. Bostick commented that Riggins needed to "get his ass kicked." Riggins once suggested that if Bostick interfered in a dispute with Dena over his son, Bostick would get "blasted." Bostick was very upset after Riggins assaulted Dena, about a week before the incident. He feared Riggins and decided to get a gun for his protection.

The day of the shooting, Dena called Bostick that morning very upset, "hysterical basically." She told him Riggins had taken her purse and asked him to get it back. Bostick left his job and drove to Riggins's house. He assumed Riggins was in "some messed up mental state." Riggins walked over to Botstick's car, which was parked on a public street abutting a vacant lot, and began conversing with him. Bostick sensed a little "animosity" in Riggins's voice. Bostick was nervous and wondered who the men across the street were. He took out his gun and kept it nearby. Bostick asked Riggins for Dena's purse. Riggins wanted to know where his son was and refused to give him anything until he saw his son. The conversation between them "started to boil" and Bostick felt himself becoming upset and afraid. Riggins was wearing baggy clothes and making motions toward the back of his pants, leading Bostick to believe he might be checking a weapon of some kind. Bostick pulled out the gun and fired. He shot Riggins because the

argument was escalating, Riggins was looking uneasy and uncomfortable, and he was "[d]oing different motions with his arms and hands and stuff like that."

APPEAL

I*

*Exclusion of Cocaine Intoxication Evidence*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

II

*Section 12022.55 Enhancement*

■ The jury made a special finding that Bostick discharged a firearm from a motor vehicle, resulting in the death or great bodily injury of the victim, within the meaning of section 12022.55.[4] Citing an "urgency clause" in the legislation which states that the Legislature intends to make "the shooting of motorists" a serious crime, Bostick contends that this section "requires a finding that the shooting occurred from a vehicle which was involved in an actual drive-by on a public street or highway," and the jury should have been so instructed.

The contention, made without any supporting case authority, must be rejected. Section 12022.55 is plain on its face that all that is required is that death or great bodily injury be inflicted "as a result of discharging a firearm from a motor vehicle." The term "drive-by" does not appear anywhere and Bostick cites no language remotely suggesting the vehicle must be in motion for the enhancement to apply. It is a cardinal rule that where a statute is facially clear and unambiguous, no judicial interpretation is necessary. (*People* v. *Bunyard* (1988) 45 Cal.3d 1189, 1238 [249 Cal.Rptr. 71, 756 P.2d 795]; *People* v. *Smith* (1987) 188 Cal.App.3d 1495, 1516-1518 [234 Cal.Rptr. 142], overruled on other grounds in *People* v. *Davis* (1994) 7 Cal.4th 797, 805 [30 Cal.Rptr.2d 50, 872 P.2d 591].)

---

*See footnote, *ante*, page 287.

[4]Section 12022.55 provides: "Notwithstanding Section 12022.5, any person who, with the intent to inflict great bodily injury or death, inflicts great bodily injury, as defined in Section 12022.7, or causes the death of a person, other than an occupant of a motor vehicle, as a result of discharging a firearm from a motor vehicle in the commission of a felony or attempted felony, shall, upon conviction of the felony or attempted felony, in addition and consecutive to the punishment prescribed for the felony or attempted felony of which he or she has been convicted, be punished by an additional term of imprisonment in the state prison for 5, 6, or 10 years."

The argument would fail even if we independently construed the Legislature's intent. We have no doubt that the gang-type drive-by shooting was one of the primary concerns in enacting section 12022.55. (see, e.g., *People* v. *Alvarez* (1992) 9 Cal.App.4th 121, 128 [11 Cal.Rptr.2d 463]), but there are other plausible purposes for the enhancement. The urgency clause cited by Bostick refers not only to the shooting of motorists, but "deter[ring] persons from *violent actions upon our public streets* and highways . . . ." (Stats. 1987, ch. 1147, § 5, p. 4060, italics added.) Street safety is therefore another independent legislative goal of the statute.

Furthermore, firing a gun from a motor vehicle is an especially treacherous and cowardly crime. It allows the perpetrator to take the victim by surprise and make a quick escape to avoid apprehension, as illustrated by the facts here. The Legislature could rationally have determined that the foregoing considerations justify imposing an increased sentence on the perpetrator.

Unlike our concurring colleague, we find no "overinclusiveness" in the statute. (Conc. opn., *post*, at p. 297.) While "drive-by" shootings certainly grab the headlines and may well have provided the impetus for passing section 12022.55, the use of a motor vehicle as a staging ground for shootings which cause death or great bodily injury, whether the vehicle happens to be in motion or stationary, on a public street or private property, is a greater evil which the Legislature could and did attempt to deter through the clear language of the statute.

Based upon the plain meaning of the statute, we reject appellant's theory of section 12022.55.

### DISPOSITION

The judgment is affirmed.

Phelan, J.,* concurred.

**KLINE, P. J.**—I concur in the judgment because I agree it was proper to exclude evidence of the victim's cocaine use and that Penal Code section 12022.55[1] is unamenable to judicial interpretation. I write separately, with respect to the latter issue, because I agree with appellant's theory of the statute and believe it appropriate to explain why I nevertheless reject his argument.

---

*Presiding Justice of the Court of Appeal, First District, Division Three, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

[1] All statutory references are to the Penal Code.

As appellant correctly points out, section 12022.55 was designed to increase the punishment for a so-called "drive-by" shooting—that is, the discharge of a weapon from a moving vehicle in an area in which large numbers of people are likely to be present—and this case arguably does not involve such a shooting.

Gang-related drive-by shootings had become a significant social problem in California in 1987—indeed, an "epidemic"[2] —when section 12022.55 was enacted, and the statute was undoubtedly addressed to this problem. As stated in *People* v. *Williams* (1993) 14 Cal.App.4th 601 [17 Cal.Rptr.2d 583], "[t]he evil addressed [by section 12022.55] is . . . *the number of victims who suffer great bodily injury from such a so-called 'drive-by.'* " (*Id.,* at p. 604, italics added.) The Attorney General has elsewhere also acknowledged that when it enacted the statute, the Legislature had in mind the "scenario involved in a gang drive-by shooting." (*In re Jose D.* (1990) 219 Cal.App.3d 582, 588 [268 Cal.Rptr. 364].)

Because section 12022.55 was enacted during a special session of the Legislature as an urgency measure (Assem. Bill No. 13, 1993-1994 First Ex. Sess.), there is little in the way of a direct legislative history.[3] The most useful indication of the purpose of the statute is provided by the legislative history of a subsequent measure virtually identical to section 12022.55 in the most critical particular. During the 1995 session, the Legislature enacted Senate Bill No. 9 (Stats. 1995, ch. 478) which submitted an initiative to popular vote. (Cal. Const., art. II, § 10.) This initiative, which as Proposition 196 passed at the statewide election held on March 26, 1996, added intentional murder "perpetrated by means of discharging a firearm from a motor vehicle" to the list of special circumstances for first degree murder for which the death penalty or life without the possibility of parole is authorized. (§ 190.2, subd. (a)(20).) Like section 12022.55, this new law does not explicitly state that the firearm must have been discharged in the course of a drive-by shooting or that the vehicle must have been moving or otherwise in use or located on a public street or highway at the time of the discharge. However, the author of the bill, Senator Ruben Ayala, and Gregory D. Totten, executive director of the California District Attorneys Association, which sponsored the measure, made clear in the ballot pamphlet that this was the legislative purpose. They stated as follows: "Murder by drive-by shooting has reached epidemic levels in California. [¶] An average of more than

---

[2]See Hutson et al., *The Epidemic of Gang-Related Homicides in Los Angeles County From 1979 Through 1994* (Oct. 4, 1995) 274 J. Am. Med. Assn. 1031.

[3]However, the urgency clause which accompanied the measure that became section 12022.55 explains that it is essential that the bill take effect immediately "in order to deter persons from violent acts *upon our public streets and highways* . . . ." (Stats. 1987, ch. 1147, § 5, p. 4060, italics added.)

one young person under the age of 18 was a victim of a drive-by shooting in Los Angeles alone *every week* in 1991, according to a recent study in the New England Journal of Medicine; 36 of these youths died. [¶] The study found that drive-by shootings are no longer confined to the inner city, but have spread everywhere. *Because the shooting is done from a moving vehicle, too often the victim is an unintended target—an innocent child, a high school student with no gang affiliation, a young mother who happens to live in a neighborhood targeted by drive-by shooters, or a harmless passer-by. [¶] It's got to stop."* (Ballot Pamp., Proposed Amends. to Cal. Const. with arguments to voters, Primary Elec. (Mar. 26, 1996), argument in favor of Prop. 196, p. 26, second italics added.)

The case law applying section 12022.55 reflects a judicial understanding that this sentence enhancement was designed to achieve the same purpose. Section 12022.55 has been applied in 12 cases that resulted in a published appellate opinion. In none of these cases was the enhancement applied to the discharge of a firearm from a vehicle not then being used on a public street or highway. In all but two of the cases the defendants were declared or suspected gang members who discharged a firearm from a vehicle then in use on a public thoroughfare. (*People* v. *Gonzales* 49 Cal.App.4th 1823 [48 Cal.Rptr.2d 293] review granted Mar. 28, 1996 (S051264) [shooting from moving truck]; *People* v. *Rand* (1995) 37 Cal.App.4th 999 [44 Cal.Rptr.2d 686], review den. [gang shooting from slowed vehicle]; *People* v. *Ceja* (1994) 26 Cal.App.4th 78 [31 Cal.Rptr.2d 475] [defendant "drove up" to victim and shot him]; *People* v. *Mortera* (1993) 14 Cal.App.4th 861 [17 Cal.Rptr.2d 782], review den. [gun fired from car while it repeatedly circled an intersection]; *People* v. *Williams, supra,* 14 Cal.App.4th 601 ["gang-related drive-by shooting"]; *People* v. *Alvarez* (1992) 9 Cal.App.4th 121 [11 Cal.Rptr.2d 463], review den. [victims shot from truck "driv[ing] slowly by them"]; *People* v. *Dominguez* (1992) 4 Cal.App.4th 516 [6 Cal.Rptr.2d 55], review den. [gang shooting from stopped car taking on a passenger]; *People* v. *Gamez* (1991) 235 Cal.App.3d 957 [286 Cal.Rptr. 894] [weapon discharged from moving truck]; *In re Sergio R.* (1991) 228 Cal.App.3d 588 [279 Cal.Rptr. 149], review den. [gang shooting from car "which was momentarily stopped"]; *In re Jose D., supra,* 219 Cal.App.3d 582 [discharge from car that "pulled up in front of house and parked for about a minute"].) In the two remaining cases the defendants shot at a peace officer during the stop of a vehicle following a chase on public streets. (*People* v. *Bright* (1996) 12 Cal.4th 652 [49 Cal.Rptr.2d 732, 909 P.2d 1354]; *People* v. *Jones* (1991) 234 Cal.App.3d 1303 [286 Cal.Rptr. 163].)

For the foregoing reasons, appellant argues that section 12022.55 should be held applicable only to the discharge of a firearm from a motor vehicle that is moving. Appellant emphasizes that "[w]hen language which is susceptible of two constructions is used in a penal law, the policy of this state

is to construe the statute as favorably to the defendant as its language and the circumstance of its application reasonably permit. The defendant is entitled to the benefit of every reasonable doubt as to the true interpretation of words or the construction of a statute." (*People* v. *Overstreet* (1986) 42 Cal.3d 891, 896 [231 Cal.Rptr. 213, 726 P.2d 1288], citing *People* v. *Weidert* (1985) 39 Cal.3d 836, 848 [218 Cal.Rptr. 57, 705 P.2d 380]; *People* v. *Davis* (1981) 29 Cal.3d 814, 828 [176 Cal.Rptr. 521, 633 P.2d 186]; *In re Jeanice D.* (1980) 28 Cal.3d 210, 217 [168 Cal.Rptr. 455, 617 P.2d 1087].)

The problem with this argument, and the reason I reject it, is that it rests on the assumption that section 12022.55 is truly ambiguous as to whether it applies to the discharge of a firearm from a vehicle not then in use. Certainly there is no facial ambiguity, in the sense that the term "motor vehicle," or any other words in the statute are "capable of being construed in two different ways by reasonably well informed people," which is the test conventionally used to determine ambiguity. (2A Sutherland, Statutory Construction (5th ed. 1992) § 45.02, pp. 5-7, § 46.04, p. 99.) Most reasonable people would agree that a "motor vehicle" is a self-propelled device used for the transportion of people or goods upon a street or highway, other than a device used exclusively upon rails or tracks. This common understanding of what constitutes a "motor vehicle," which is consistent with pertinent statutory definitions (see Veh. Code, §§ 415, 670), does not depend on whether the vehicle is moving at any particular time, and has even been employed to describe a vehicle that is temporarily inoperable. (*Arrellano* v. *Moreno* (1973) 33 Cal.App.3d 877, 882 [109 Cal.Rptr. 421].)

The asserted ambiguity in section 12022.55 arises not from the language of the statute but by considering that reasonably clear language in the light of the apparent legislative purpose. This is not, however, the sort of ambiguity that calls for judicial interpretation. Courts inquire as to the legislative purpose to *resolve* ambiguity, not to create it. The fact that section 12022.55 has a broader reach than may have been necessary to achieve its purpose does not mean it is unclear. The ambiguity that warrants judicial interpretation must be inherent in the statute itself or in the entire scheme of which it is part. Thus, while courts sometimes reject the so-called "plain meaning" of words in a statute, they do so only where the literal meaning would either frustrate the statutory purpose (see, e.g., *Friends of Mammoth* v. *Board of Supervisors* (1972) 8 Cal.3d 247, 263 [104 Cal.Rptr. 761, 502 P.2d 1049]; *Leslie Salt Co.* v. *San Francisco Bay Conservation etc. Com.* (1984) 153 Cal.App.3d 605, 617 [200 Cal.Rptr. 575]) or lead to absurd results. (See, e.g., *People* v. *Fulton* (1984) 155 Cal.App.3d 91, 102 [201 Cal.Rptr. 879].) That is not the case here.

Application of section 12022.55 to the discharge of a firearm from a vehicle not then being operated would not defeat or obstruct the legislative

purpose because it is not inconsistent with application of the enhancement to conventional drive-by shootings; nor would such application be patently absurd, as a vehicle provides a redoubt that might facilitate the commission of criminal acts even if it is not at that moment being used for transportation.[4] Thus, because appellant cannot demonstrate "that the natural and customary import of the statute's language is either 'repugnant to the general purview of the act,' or for some other compelling reason, should be disregarded, this court must give effect to the statute's 'plain meaning.' " (*Tiernan* v. *Trustees of Cal. State University & Colleges* (1982) 33 Cal.3d 211, 218-219 [188 Cal.Rptr. 115, 655 P.2d 317], quoting 2A Sutherland, Statutory Construction (4th ed. 1973) § 46.01, p. 49.)[5]

Appellant's contention that section 12022.55 is not plain on its face, and that the limitation he urges may therefore be judicially implied, rests primarily on *In re Jose D, supra,* 219 Cal.App.3d 582. But the determination in that case centered on a distinctive issue not present here. The question in *Jose D.* was whether section 12022.55 applied to a person who was in the vehicle from which the firearm was discharged but did not personally discharge the weapon and was culpable of the underlying offense only as an aider and abettor. The general rule regarding this question is that " 'if a statute is intended to impose a derivative liability on some person other than the actor, there must be some legislative direction that it is to be applied to persons who do not themselves commit the proscribed act.' " (219 Cal.App.3d at p. 587, quoting *People* v. *Walker* (1976) 18 Cal.3d 232, 241 [133 Cal.Rptr. 520, 555 P.2d 306].) Due to its presumed awareness of this "basic rule," the court observed, " 'the Legislature has been quite explicit

[4] The United States Supreme Court has, for example, "specifically recognized the inordinate risk confronting an officer as he approaches a person seated in an automobile. 'According to one study, approximately 30% of police shootings occurred when a police officer approached a suspect seated in an automobile. Bristow, Police Officer Shootings—A Tactical Evaluation, 54 J. Crim. L. C. & P. S. (1963).' *Adams* v. *Williams,* 407 U.S. 143, 148 n. 3 [32 L.Ed.2d 612, 618, 92 S.Ct. 1921] (1972)." (*Pennsylvania* v. *Mimms* (1977) 434 U.S. 106, 110 [54 L.Ed.2d 331, 336-337, 98 S.Ct. 330].)

[5] Defendant has staked his appeal on questions of statutory construction and not any claim that the statute may be unconstitutional on its face or as applied to him. He does not contend, for instance, that the statute is fatally overinclusive for punishing conduct not within the apparent legislative purpose, or is underinclusive for excluding conduct which may appear materially indistinguishable from included conduct. (See *Brown* v. *Merlo* (1973) 8 Cal.3d 855, 876-877 [106 Cal.Rptr. 388, 506 P.2d 212, 66 A.L.R.3d 505]; cf. *United States* v. *McDougherty* (9th Cir. 1990) 920 F.2d 569, 572 [federal enhancement for distribution of drugs within 1,000 feet of elementary school]; *United States* v. *Thornton* (9th Cir. 1990) 901 F.2d 738, 740 [same].) Overinclusiveness may or may not appear in the statute's facial applicability to shootings in which the defendant's presence in a car was mere happenstance. As for underinclusiveness, I confess bewilderment at the statute's *exclusion* of shootings in which the *victim* is "an occupant of a motor vehicle." (§ 12022.55.) Like the majority, however, I express no opinion on how such challenges might fare should they be properly raised in another case.

when it intends an enhancement provision to apply to a defendant even though he himself does not commit the proscribed act.'" (*Jose D.*, *supra*, at p. 587, quoting *People* v. *Piper* (1986) 42 Cal.3d 471, 477 [229 Cal.Rptr. 125, 722 P.2d 899].) Therefore, because section 12022.55 did not explicitly impose an increased punishment on one merely present in a vehicle from which a firearm was discharged, it did not apply derivatively.

The failure of the Legislature to expressly indicate whether section 12022.55 applies to the discharge of a firearm from a motor vehicle not then in use does not pertain to the question of derivative liability at issue in *Jose D.*, nor relate to the subject of any established judicial presumption the Legislature can overcome only by speaking explicitly. (See, e.g., *In re Estrada* (1965) 63 Cal.2d 740 [48 Cal.Rptr. 172, 408 P.2d 948] [which holds that when a statute mitigating punishment becomes effective after the commission of the prohibited act but before final judgment the lesser punishment provided by the new law is to be imposed in the absence of an express statement to the contrary by the Legislature].) The silence of section 12022.55 as to this matter therefore provides no basis upon which we may presume a meaning not apparent on the face of the statute.

Because it does not serve the purpose of section 12022.55, the imposition of a five-year sentence enhancement on a defendant who discharges a firearm from a vehicle not then in use on or near a public street or highway was probably not anticipated by the Legislature, which might therefore wish to reconsider the overinclusiveness of the statute. The failure of the Legislature to anticipate the gratuitously broad application the statute may have cannot, however, influence our assessment of its ambit. As has been noted, "if [the Legislature] has made a choice of language which fairly brings a given situation within a statute, it is unimportant that the particular application may not have been contemplated by the legislators." (*Barr* v. *United States* (1944) 324 U.S. 83, 90 [89 L.Ed. 765, 771, 65 S.Ct. 522]; *Sears Roebuck & Co.* v. *United States* (C.C.P.A. 1974) 504 F.2d 1400, 1402.) It is similarly unimportant whether a court believes the unanticipated application is sensible or just. Where, as here, the reasonably clear meaning of the statute is neither incompatible with its purpose nor absurd, we may not disregard it.

For the foregoing reasons, I concur in the judgment.

A petition for a rehearing was denied June 27, 1996, and appellant's petition for review by the Supreme Court was denied September 4, 1996.